IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

**FILED**

**June 12, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 11-1701

THE WEST VIRGINIA DEPARTMENT OF HEALTH
AND HUMAN RESOURCES; THE WEST VIRGINIA OFFICE OF BEHAVIORAL
HEALTH SERVICES; THE WEST VIRGINIA BUREAU FOR
MEDICAL SERVICES; and THE WEST VIRGINIA OFFICE OF
HEALTH FACILITY LICENSURE AND CERTIFICATION,
Defendants Below, Petitioners

v.

GREGORY PAYNE, individually and as Executor of the Estate of
CRAIG ALLEN PAYNE, and BETTY JO PAYNE, individually,
Plaintiffs Below, Respondents

Appeal from the Circuit Court of Kanawha County
The Honorable Carrie Webster, Judge
Civil Action No. 07-C-1407

REVERSED AND REMANDED

Submitted: March 26, 2013
Filed: June 12, 2013

M. Andrew Brison, Esq.                     William C. Forbes, Esq.
Joshua R. Martin, Esq.                     W. Jesse Forbes, Esq.
ALLEN, KOPET & ASSOCIATES, PLLC            FORBES LAW OFFICES, PLLC
Charleston, West Virginia                  Charleston, West Virginia
Attorneys for Petitioners                  Attorneys for Respondents

JUSTICE WORKMAN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court."  Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002).

2.      "A circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine."  Syl. Pt. 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009).

3.      "Although our standard of review for summary judgment remains *de novo*, a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review.  Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed."  Syl. Pt. 3, *Fayette County National Bank v. Lilly*, 199 W. Va. 349, 484 S.E.2d 232 (1997).

4.      A circuit court's order denying summary judgment on qualified immunity grounds on the basis of disputed issues of material fact must contain sufficient detail to permit meaningful appellate review.  In particular, the court must identify those material facts which are disputed by competent evidence and must provide a description

i

of the competing evidence or inferences therefrom giving rise to the dispute which preclude summary disposition.

5. "The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition." Syl. Pt. 1, *Hutchison v. City of Huntington*, 198 W. Va. 139, 479 S.E.2d 649 (1996).

6. "In the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29–12A–1, *et seq*., and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer." Syl. Pt. 6, *Clark v. Dunn*, 195 W.Va. 272, 465 S.E.2d 374 (1995).

7. "'A public executive official who is acting within the scope of his authority and is not covered by the provisions of W. Va. Code 29-12A-1, *et seq.* [the West Virginia Governmental Tort Claims and Insurance Reform Act], is entitled to qualified immunity from personal liability for official acts if the involved conduct did not

violate clearly established laws of which a reasonable official would have known. . . .' Syllabus, *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992)." Syl. Pt. 3, in part, *Clark v. Dunn,* 195 W.Va. 272, 465 S.E.2d 374 (1995).

8. "If a public officer is either authorized or required in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby." Syl. Pt. 4, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995).

WORKMAN, Justice:

The West Virginia Department of Health and Human Resources ("DHHR"), Office of Behavior Health Services ("BHS"), Bureau for Medical Services ("BMS"), and Office of Health Facility Licensure and Certification ("OHFLAC") (hereinafter collectively "DHHR defendants") appeal the November 10, 2011, order of the Circuit Court of Kanawha County, denying their motion for summary judgment on qualified immunity grounds. On appeal, the DHHR defendants contend that the circuit court erred in finding that genuine issues of material fact existed as to whether the actions of the DHHR defendants were discretionary, thereby precluding summary judgment. Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we find that the DHHR defendants are entitled to qualified immunity; therefore, we reverse the order of the circuit court and remand the case for entry of an order granting summary judgment and dismissing the action against them.

## I.  FACTS AND PROCEDURAL HISTORY

On February 12, 2007, Craig Allen Payne, 22 (hereinafter "Payne"), died after choking on a hot dog fed to him at the D.E.A.F. Education and Advocacy Focus, Inc. (hereinafter "DEAF") day habilitation center in Nitro, known as the "West Sattes" site. Payne suffered from severe cerebral palsy and had feeding and swallowing difficulties as a result. Following Payne's death, investigations of DEAF by OHFLAC

1

and West Virginia Advocates ("WVA" or the "WVA report")[1] revealed serious

deficiencies which posed a threat to the health, safety and welfare of its clients, leading to

the revocation of DEAF's license in March, 2007.

In particular, the investigations revealed that Payne's potential for food

aspiration was evident and medically documented, but the facility failed to provide him

with a modified diet.[2] Moreover, the investigations revealed that the direct-care staff

member feeding him at the time of the incident was a newly-hired, former felon,[3] who

had not been trained on Payne's needs, nor had he received proper training on the

---

[1] WVA is a private, non-profit agency which describes itself as "the federally mandated protection and advocacy system for people with disabilities in West Virginia."

[2] The investigation revealed deficiencies involving the facility's awareness of, yet failure to provide for Payne's medical needs relative to his feeding and swallowing difficulties and inconsistent documentation regarding same, as follows:  1) notes from a November 2006 meeting documenting complaints by staff that they feared Payne was going to "choke to death" during feedings; 2) a 2004 swallowing study revealing that he had swallowing dysfunction and could not swallow solid foods, which was not properly documented in his nursing assessment; 3) inaccurate references in Payne's medical documentation to him being on a "regular diet"; 3) notations in his chart that he was to be fed in the presence of a nurse, despite the nurse on duty at the time of his death being unaware of this requirement; 4) Payne's most recent Individual Program Plan identified a need for additional nursing units to provide "closer care and medical supervision" as well as development of a feeding protocol, although no protocol had been developed as of the date of his death.

[3] The record reveals that the direct-care worker had been convicted of armed robbery.  He had been employed by DEAF for approximately one month.

2

Heimlich maneuver.[4] The investigation further revealed that the facility had no emergency plan in place; therefore, when Payne choked, there were delays in contacting emergency personnel, and staff members carried him almost 200 feet to a nearby exit to await the ambulance. Apparently, only the nurse on duty eventually attempted the Heimlich maneuver, as opposed to the direct-care worker feeding him.

Significantly, DEAF's license had previously been revoked approximately one year prior to the incident, but provisionally reinstated upon submission and fulfillment of a written "plan of correction," as described in West Virginia Code of State Rules § 64-11-4.6.[5] The revocation was occasioned by a March, 2006, "survey" or inspection of several of DEAF's facilities, including a residential facility located in Boone County, West Virginia and the West Sattes facility at issue.

---

[4] Although the direct-care staff member feeding Payne had participated in a CPR course thirteen days prior to Payne's death, neither he nor anyone else in the class was required to perform a "return demonstration" to assess their ability to perform CPR or the Heimlich maneuver by the trainer. The individual who administered the training advised she did not require "return demonstration" for CPR because there were no mouth shields for the dummy; as to why she required no Heimlich demonstration, she stated, "I know I should have done it, but I didn't." In addition, the registered nurse who did perform the Heimlich maneuver did not have an adult CPR card.

[5] West Virginia Code of State Rules §§ 64-11-4.6.a and -4.6.a.1 provide that in the event an inspection report reveals deficiencies, a facility "shall submit to the Secretary for approval a written plan to correct all deficiencies that are in violation of this rule" which specifies "[a]ction taken or procedures proposed to correct the deficiencies and prevent their reoccurrence[.]"

3

The deficiencies which gave rise to the revocation and subsequent reissuance of a provisional license the year preceding Payne's death appear to fall into several discrete categories: 1) cleanliness of various facilities, including the West Sattes site; 2) charting and documentation errors; and, most critically, 3) frequent medication administration errors or outright omissions. In response to the revocation and, as required by a "Memorandum of Understanding" between the DHHR and DEAF, reflecting the "plan of correction," DEAF fired its executive director and closed the Boone County residential facility. The Memorandum of Understanding was approved by DHHR.[6] Subsequently, DHHR issued a provisional license which was effective for six months, after which a regular renewal license was issued.[7]

On July 7, 2007, Payne's father, Gregory Payne, individually and as Executor of his estate, and his mother, Betty Jo Payne, individually, (hereinafter "the

---

[6] The Memorandum of Understanding provided, in pertinent part, that: 1) DEAF would administer medications through nurses only; 2) DEAF would report any medication error immediately, terminate any employee who made a medication error, and retrain and recertify "Approved Medication Assistive Personnel" to work in other roles at DEAF; 3) DEAF would terminate its executive director; 4) DEAF would close its residential facilities and work with residents to find replacement facilities; 5) DEAF would enter a Plan of Correction for all deficiencies noted in the survey giving rise to the revocation; 6) DEAF would provide OHFLAC a weekly progress summary; 7) OHFLAC would monitor summaries and do an on-site follow up visit no later than April 28, 2006; OHFLAC "reserve[d] the right to do additional on-site visits at any time[.]"

[7] The record is devoid of any information regarding the results of any intervening inspections, if any, which may have occurred between the license revocation, issuance of the provisional license, and the issuance of a regular renewal license upon expiration of the provisional license.

4

Paynes" or "the respondents") filed suit against the DHHR defendants, as well as DEAF and Braley & Thompson, Inc., a DEAF service provider. The allegations against the DHHR defendants are alleged strictly in terms of negligence.[8] In particular, respondents allege that the DHHR defendants were negligent in their "monitoring and enforcement of the applicable standards of care, policies, protocols and management of the subject facility." In that regard, respondents allege generally that the DHHR defendants were negligent in "failing to ensure" that DEAF 1) properly trained staff; 2) complied with state and federal regulations; 3) had an adequate workforce; and 4) disclosed "licensing issues and/or problems" to clients.

DEAF and Braley & Thompson settled for a collective $850,000.00. Following this settlement, the DHHR defendants moved to dismiss pursuant to West Virginia Rule of Civil Procedure 12(b)(6), asserting defenses on the basis of both qualified immunity and the public duty doctrine. Thereafter, on March 17, 2009, the DHHR defendants moved for summary judgment; a hearing was held on February 17,

---

[8] As noted above, the "DHHR defendants" herein include the Department of Health and Human Resources ("DHHR"), the Office of Behavior Health Services ("BHS"), Bureau for Medical Services ("BMS"), and Office of Health Facility Licensure and Certification ("OHFLAC"). While it is manifest that each agency has differing duties and responsibilities, these defendants have been given collective treatment throughout the underlying litigation. Neither the briefs nor the appendix record reflect defendant-specific allegations or analysis. As such, this Court will treat these defendants collectively for purposes of this opinion, unless otherwise stated herein.

5

2010.[9]  A supplemental motion for summary judgment was filed on February 18, 2011. On November 10, 2011, the circuit court entered an order denying the DHHR defendants' motion for summary judgment stating simply that there were "disputed material facts . . . which could allow the trier of fact to determine that the decisions made by the defendants in connection with and relating to plaintiffs' claim were not discretionary."  This appeal followed.

## II.  STANDARD OF REVIEW

It is well-established that "[t]his Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002).  Moreover, "[a] circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine."  Syl. Pt. 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009).[10]

---

[9] A complete transcript of this hearing was not made part of the appendix record; the portion which was included does not include any argument regarding the merits of the motion for summary judgment.

[10] Although the DHHR defendants moved for summary judgment on both qualified immunity and public duty doctrine grounds, the DHHR defendants have properly appealed only the denial of summary judgment on qualified immunity grounds to this Court, inasmuch as only that issue is subject to interlocutory appeal.  Nevertheless, the Paynes dedicate a significant portion of their brief to the public duty doctrine and the special relationship exception.

(continued . . .)

## III. DISCUSSION

The DHHR defendants argue that the circuit court erred in failing to find that they are entitled to qualified immunity, which error was occasioned by both its misapprehension of the law and its unsupported determination that there were unresolved factual issues precluding summary disposition of the issue.[11] With regard the latter, we will first address the deficiencies of the circuit court's order denying summary judgment.

_____

We take this opportunity to reiterate the difference between qualified immunity and the public duty doctrine. Qualified immunity is, quite simply, immunity from suit. The public duty doctrine is a defense to negligence-based liability, i.e. an absence of duty. *See Holsten v. Massey,* 200 W.Va. 776, 782, 490 S.E.2d 864, 871 (1997) ("The public duty doctrine, however, is not based on immunity from existing liability. Instead, it is based on the absence of duty in the first instance."). This Court dedicated an extensive discussion to the similarities, yet fundamental difference, between the two concepts in *Parkulo v. West Virginia Bd. of Probation and Parole,* 199 W. Va. 161, 172, 483 S.E.2d 507, 518: "[The public duty doctrine] is not a theory of governmental immunity, 'although in practice it achieves much the same result.'" (quoting Syl. Pt. 1, *Benson v. Kutsch*, 181 W. Va. 1, 380 S.E.2d 36 (1989)). Although both defenses are frequently raised, as in this case, only qualified immunity, if disposed of by way of summary judgment, is subject to interlocutory appeal. All other issues are reviewable only after they are subject to a final order: "In cases where interlocutory review of qualified immunity determinations occurs, any *summary judgment* rulings on grounds other than immunity are reserved for review at the appropriate time[.]" *City of St. Albans v. Botkins,* 228 W. Va. 393, 397, n.13, 719 S.E.2d 863, 867, n.13 (2011) (emphasis added). *Cf. Fucillo v. Kerner,* No. 11-1783 (W. Va., June 5, 2013) (addressing collateral issue of whether private cause of action exists on interlocutory appeal, where both qualified immunity and collateral issues were disposed of under W.V.R.C.P. 12(b)(6) and collateral issue is dispositive of the case); *Jarvis v. West Virginia State Police,* 227 W. Va. 472, 711 S.E.2d 542 (2010) (same).

[11] Although the DHHR defendants advance five different assignments of error in their Notice of Appeal, only two are addressed in their brief; regardless, both of the assignments of error briefed involve the same issue—whether the DHHR defendants are entitled to qualified immunity—and will be addressed as one. *See Evans v. Holt*, 193 W. (continued . . .)

**A.**

***Sufficiency of the Order Denying Summary Judgment***

This Court has previously held:

> Although our standard of review for summary judgment
> remains de novo, a circuit court's order granting summary
> judgment must set out factual findings sufficient to permit
> meaningful appellate review. Findings of fact, by necessity,
> include those facts which the circuit court finds relevant,
> determinative of the issues and undisputed.

Syl. Pt. 3, *Fayette Cnty. Nat'l Bank v. Lilly*, 199 W. Va. 349, 484 S.E.2d 232 (1997). *See*

*also* Syl. Pt. 3, *Keesecker v. Bird*, 200 W. Va. 667, 490 S.E.2d 754 (1997). Although this

holding is phrased in terms of *granting* summary judgment, both the holding and our

cases discussing it make clear that a lower court's factual findings when ruling on

summary judgment—whether denying or granting—must be sufficient to elucidate to this

Court the basis for its ruling. In fact, in *Lilly,* this Court stated that "the circuit court's

order must provide clear notice to all parties and the reviewing court as to the rationale

applied in granting *or denying* summary judgment." 199 W.Va. at 354, 484 S.E.2d at 237

(emphasis added). *See also State ex rel. West Virginia Dept. of Health and Human*

*Resources v. Kaufman,* 203 W.Va. 56, 506 S.E.2d 93 (1998) (granting writ of prohibition

preventing enforcement of orders denying summary judgment on qualified immunity

Va. 578 n.2, 457 S.E.2d 515 n.2 (1995) (consolidating redundant assignments of error); *Robertson v. B. A. Mullican Lumber & Mfg. Co, L. P.*, 208 W. Va. 1, n.1, 537 S.E.2d 317, n.1 (2000) (combining five errors into two).

8

grounds and remanding for entry of order specifying rationale for denying summary judgment).

With respect to the order at issue, the portion of the circuit court's order dealing with qualified immunity contains a ten-paragraph set of "Findings of Fact" and a six-paragraph section containing "Conclusions of Law." However, despite its length, it is nothing more than a conclusory disposal of the qualified immunity issue, with a talismanic referral to "disputed material facts." In particular, the majority of the "Findings of Fact" are undisputed, general background to the events giving rise to the suit; the only paragraph containing "disputed" issues of fact is a simple conglomeration of bare allegations from the complaint.[12] The circuit court then concludes that "the

---

[12] Citing to the Paynes' complaint, paragraph eight of the circuit court's order states:

> The plaintiffs' complaint also asserts that the combined negligence of the other named defendants- DHHR, OHFLAC and the West Virginia Bureau of Medical Services proximately caused the decedent's death: [sic] These negligent acts and omissions include:
>
>> The monitoring and enforcement of the applicable standards of care, policies, protocols and management of the subject facility; failing to ensure that the subject facility was adhering to established protocols for training employees or protocols for the medical and physical care for its clientele; failing to ensure that the non-state agency co-defendants were in compliance with state and federal law/regulations; failing to ensure that the non-state agency co-defendants had trained staff in providing for the needs of people with disabilities participating in the Medicaid Home and Community Based Waiver; failing to ensure that the non-state agency co-

(continued . . .)

plaintiffs have shown that there are disputed material facts, and have presented evidence which could allow the trier of fact to determine that the decisions made by the defendants in connection with and relating to plaintiffs' claims were not discretionary."

The order references no "evidence" which the Paynes "presented," much less identifies the "disputed material facts" which precluded summary judgment. The order notes that "[the Paynes'] negligence claim centers on the [DHHR defendants'] failure to uphold and act upon certain laws and regulations they are duty bound to uphold," but does not identify those laws and regulations.[13] The order further states that the Paynes seek to defeat qualified immunity on the basis that "the actions/inactions of defendants' employees/agents fall outside the scope of their normal duties and responsibilities." Not only does the order fail to identify the disputed material facts

---

defendants implemented Individual Program Plans; failing to ensure direct care staff received training in CPR-First Aid, and other training and certification similar to that required by certified nursing assistants; failing to ensure that non-state agency co-defendants maintained an adequate available workforce to provide services; failing to monitor and enforce state and federal law and regulations that govern medical providers to people with disabilities; and failing to disclose licensing issues and/or problems with the subject facility to the clients of the non-state agency co-defendants. See ¶¶ 16-25, Plaintiffs' Amended Complaint.

[13] In fairness to the circuit court, however, the Paynes likewise failed to identify the specific "laws and regulations" the DHHR defendants allegedly violated, as discussed more fully *infra.*

10

underlying this contention, but it fails to identify which actions/inactions are even alleged to fall outside of the DHHR defendants' normal duties and responsibilities.[14]

This Court has previously explained that "[t]he function of summary judgment is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" *Powderidge Unit Owners Ass'n v. Highland Properties, Ltd.*, 196 W. Va. 692, 697, 474 S.E.2d 872, 877 (1996) (quoting *Hanlon v. Chambers*, 195 W.Va. 99, 106, 464 S.E.2d 741, 748 (1995)). We have further held that

> [t]he party opposing a motion for summary judgment may not rest on allegations of his or her unsworn pleadings and must instead come forth with evidence of a genuine factual dispute. Mere allegations are insufficient in response to a motion for summary judgment to show that there is a genuine issue for trial.

*Crum v. Equity Inns, Inc.*, 224 W.Va. 246, 254, 685 S.E.2d 219, 227 (2009); *see also Powderidge,* 196 W.Va. at 698, nn. 10, 11, 474 S.E.2d at 878, nn. 10, 11. Likewise, an order denying summary judgment on the basis of unidentified "disputed material facts" referring merely to the allegations in the pleadings is insufficient for purposes of appellate review. This is particularly so in the case of qualified immunity which this

---

[14] In contrast, however, the portion of the circuit court's order denying summary judgment on the basis of the public duty doctrine contains reference to and descriptions of specific documentary evidence. While we do not find occasion to pass upon the adequacy of that portion of the circuit court's order inasmuch as that aspect of the circuit court's ruling is not on appeal, *see* n.10 *supra*, we reference it to highlight the disparity in the circuit court's handling of the two issues before it.

11

Court has held is immediately reviewable to ensure that immune defendants' right "'not to be subject to the burden of trial'" remains inviolate. *Robinson,* 223 W. Va. at 833, 679 S.E.2d at 665 (quoting *Hutchison v. City of Huntington,* 198 W. Va. 139, 148, 479 S.E.2d 649, 658 (1996)). As such, we hold that a circuit court's order denying summary judgment on qualified immunity grounds on the basis of disputed issues of material fact must contain sufficient detail to permit meaningful appellate review. In particular, the court must identify those material facts which are disputed by competent evidence and must provide a description of the competing evidence or inferences therefrom giving rise to the dispute which preclude summary disposition.

The foregoing notwithstanding, although this Court has not hesitated to remand a case due to insufficient findings of fact,[15] we find that our *de novo* review of the record before us permits us to resolve this particular case without further detail or analysis from the circuit court.[16]

## B.

### *Qualified Immunity*

---

[15] *See Hively v. Merrifield,* 212 W. Va. 804, 808, n.6, 575 S.E.2d 414, 418, n.6 (2002) (collecting cases in which this Court has remanded for insufficient findings of fact).

[16] *See Toth v. Bd. of Parks and Recreation Comm'rs,* 215 W. Va. 51, 593 S.E.2d 576 (2003) (resolving issues on appeal in absence of detailed order from circuit court); *see also Ward v. Cliver*, 212 W. Va. 653, 575 S.E.2d 263 (2002) (same); *Fayette Cnty. Nat'l Bank*, *supra* (same).

We begin our analysis by observing that, admittedly, our caselaw analyzing and applying the various governmental immunities—sovereign, judicial, quasi-judicial, qualified, and statutory—to the vast array of governmental agencies, officials, employees and widely disparate factual underpinnings has created a patchwork of holdings.[17] These various holdings against which each particular set of facts must be analyzed lead inevitably to a situation where some allegations fit more comfortably with certain syllabus points than others. Much of the absence of harmony is simply the nature of the beast: immunities must be assessed on a case-by-case basis in light of the governmental entities and/or officials named and the nature of the actions and allegations giving rise to the claim. *See* Syl. Pt. 9, in part, *Parkulo,* 199 W. Va. 161, 483 S.E.2d 507 ("The existence of the State's immunity [] must be determined on a case-by-case basis."). As such, we will examine the claims in the case *sub judice* under the scope of the particular qualified immunity holdings which most accurately conform to the nature of the particular allegations.

---

[17] For example, some of our holdings appear to describe qualified immunity principles more comfortably applicable to the actions and functions of high-level government officials; others are crafted to be applicable and reflect the daily functions and activities of an average government employee. Some of our caselaw makes reference to violations of "clearly established *rights*" while others make reference to "clearly established *laws*." Much of our caselaw pertains to allegations of intentional acts, while some is phrased in terms of negligence-based allegations. However, qualified immunity is not a "one-size-fits-all" proposition. The nuances and variations within our caselaw have been perpetuated, at least in part, by the highly fact-specific nature of qualified immunity analysis.

*1. Negligent Failure to Monitor/Enforce*

The DHHR defendants maintain that the circuit court erred in failing to find them entitled to qualified immunity inasmuch as respondents have alleged a simple negligence case against them and failed to produce evidence that they violated a clearly established law. Respondents argued below that the DHHR defendants were generally negligent in their "enforcement and monitoring duties," as pertained to DEAF, based almost exclusively on the WVA report which was critical of the DHHR defendants' oversight of the facilities within its purview.[18] The DHHR defendants counter that the WVA investigator conceded during her deposition that, in spite of these criticisms, she did not investigate DHHR and had uncovered no evidence that the DHHR defendants had failed to comply with any of its regulatory requirements as pertained to DEAF.

As noted above, there is no question that respondents' complaint is grounded exclusively in negligence, alleging that the DHHR defendants negligently

---

[18] Under the "Recommendations" section of its report, WVA stated that it

> finds that service providers are not being adequately monitored to enforce compliance with the requirements of the WVDHHR Medicaid Title XIX MR/DD Home and Community Based Waiver Program. As a result individuals using the [Program] are at an increased risk of neglect. [The DHHR defendants] are responsible to monitor and enforce compliance for the [Program]. Inadequate enforcement and monitoring of service providers are placing very vulnerable individuals at increased risk of abuse, neglect and death.

14

failed to provide proper oversight and enforcement of applicable laws. To that end, this Court has held generally:

> In the absence of an insurance contract waiving the defense,[19] *the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency* not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29–12A–1, *et seq.*, and against an officer of that department acting within the scope of his or her employment, *with respect to the discretionary judgments, decisions, and actions of the officer.*

Syl. Pt. 6, *Clark v. Dunn*, 195 W.Va. 272, 465 S.E.2d 374 (1995) (emphasis added) (footnote added). However, once the "judgments, decisions, and actions" of a governmental official are determined to be discretionary, the analysis does not end. Rather, even if the complained-of actions fall within the discretionary functions of an agency or an official's duty, they are not immune if the discretionary actions violate "clearly established laws of which a reasonable official would have known":

> "A public executive official who is acting within the scope of his authority and is not covered by the provisions of W. Va. Code 29-12A-1, *et seq.* [the West Virginia Governmental Tort Claims and Insurance Reform Act], is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known. . . . Syllabus, *State v. Chase Securities, Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992).

Syl. Pt. 3, in part, *Clark, supra.*[20]

---

[19] The Paynes do not assert that the insurance policy at issue waives any immunities.

[20] Although this particular syllabus point is phrased in terms of the immunity of "public executive official," it has equal application to a suit solely against State agencies (continued . . .)

Our analysis requires, therefore, an examination of the DHHR defendants' oversight and enforcement duties and obligations relative to behavioral health centers to assess whether they derive from discretionary "judgments, decisions, and actions" and if whether, even so, their actions or inactions violated any "clearly established law."[21] West Virginia Code § 27-9-1 (1977) (Repl. Vol. 2008) is the enabling statute for the legislative rules set forth in West Virginia Code of State Rules Title 64, Series 11 governing "Behavioral Health Centers Licensure" and provides that hospitals, centers, or institutions providing care or treatment of the mentally ill or intellectually disabled must first be licensed by the DHHR.[22] Significantly, West Virginia Code § 27-9-1 further provides that "[t]he secretary [of the DHHR] may make such terms and regulations in regard to the conduct of any licensed hospital, center or institution, or part of any licensed hospital,

---

inasmuch as the State's immunity is "coterminous" with that of the official whose acts are at issue:

> [T]he immunity of the State is coterminous with the qualified immunity of a public executive official whose acts or omissions give rise to the case. . . .

Syl. Pt. 9, in part, *Parkulo,* 199 W. Va. 161, 483 S.E.2d 507. As discussed *infra*, authority for regulation of behavioral health centers is vested with the Secretary of the DHHR. W. Va. C.S.R. § 64-11-2.2.

[21] *See* n.8, *supra.*

[22] The 2010 amendment to West Virginia Code § 27-9-1 made minor clarifications to the statute, none of which are relevant to the issues herein.

center or institution, *as he or she thinks proper and necessary*." (emphasis added).  As such, the determination as to how facilities under Title 64, Series 11 must operate and conduct their daily affairs and to what extent commensurate regulatory oversight for such operation and affairs falls on the DHHR and its subsidiary agencies lies entirely with the discretion of the Secretary of the DHHR.

As noted above, the "terms and regulations" promulgated for the licensure and conduct of behavioral health centers are set forth in West Virginia Code of State Rules § 64-11-1 *et seq.*  However, in terms of the DHHR's oversight and monitoring of behavioral health facilities, the regulations require only that a center is inspected upon application for an initial, renewal, or provisional license and thereafter, at least once every two years or once a year for residential facilities.  W. Va. C.S.R. §§ 64-11-4.1.f.1 and 64-11-4.3.c.[23]  The DHHR "may" conduct unannounced inspections in response to a complaint, but is not required to do so.  W. Va. C.S.R. § 64-11-4.4.b.  The inspections are to include, but are not limited to "[o]bservation of service delivery . . . [r]eview of life safety and environment . . . [r]eview of clinical and administrative records; and . . . [i]nterviews with consumers (with the consumer's consent), staff and administrators."  W. Va. C.S.R. §§ 64-11-4.3.b.1 through 4.

---

[23] West Virginia C.S.R. § 64-11-4.1.f.1 provides "[n]either an initial, renewal or a provisional license shall be issued unless an inspection has been made."  West Virginia C.S.R. § 64-11-4.3.c provides "[e]ach licensed Center is inspected at least once every two (2) years, except for residential treatment facilities that are inspected at least once a year."

The DHHR is required to issue a report within ten working days of an inspection, which then triggers an obligation on behalf of the facility to submit to the DHHR a signed, written "plan of correction" to address any deficiencies identified in the report; the plan is to include "[a]ction taken or procedures proposed to correct the deficiencies and prevent their reoccurrence [and] . . . [d]ate of completion of each action taken or to be taken[.]" W. Va. C.S.R. §§ 64-11-4.3.f and 64-11-4.6.a.1 through 3. The regulations provide that "[t]he Secretary shall approve, modify or reject the proposed plan of correction in writing" and, critically, "[t]he Secretary may determine if corrections have been made." W. Va. C.S.R. §§ 64-11-4.6.b and 64-11-4.6.f. Following the inspection and any plans of correction, "the Secretary shall, if there is substantial compliance with this rule," issue an initial, provisional, or renewal license. W. Va. C.S.R. § 64-11-4.1.f.2.[24]

However, as noted, short of licensure or bi-annual inspections, approval of plans of correction, and ascertainment of whether corrections have been made, neither the

---

[24] A provisional license may be issued if there is not "substantial compliance with this rule, but does not pose a significant risk to the rights, health and safety of a consumer." Although the parties focus on the issuance of the provisional license to DEAF following the March 2006 revocation and plan of correction, we find that this provision is not particularly germane to our discussion inasmuch as DEAF's provisional license had clearly expired and DEAF was operating under a regular renewal license at the time of Payne's death, per the Revocation Order of March 2007. Again, the record reflects no information regarding the circumstances under which the provisional license was converted to a regular renewal license, nor do the the Paynes' allegations center around the issuance of the regular renewal license. *See* n.7, *supra*.

18

statutes nor applicable regulations require further monitoring or oversight duties by the DHHR defendants.[25] The regulations delegate to the facilities responsibility for governance and management of the day-to-day affairs of the facilities, which necessarily includes staffing, training, and regulatory compliance. Certainly, the entire purpose for the DHHR defendants' inspections is to audit for compliance with the regulations governing the facilities' duties in that regard. However, nothing in the regulations requires greater oversight or involvement in the day-to-day operations of the facilities than that occasioned by the bi-annual or licensure inspections and any plans of corrections resulting therefrom. Respondents have presented no evidence that the DHHR defendants failed to timely and properly conduct inspections or approve and require implementation of plans of correction. In fact, despite repeated reference to the DHHR defendants' "failure to uphold the very laws and regulations that they are charged with sustaining," at no time do respondents identify a specific law, statute, or regulation which

---

[25] The Paynes also contend that the DHHR defendants "affirmatively undertook special duties with respect to monitoring [DEAF]" following the 2006 revocation and plan of correction and negligently failed to "follow through" on these additional monitoring obligations. Specifically, and without citation to any evidence in the record, they assert in their brief that "petitioners were supposed to make weekly inspections of the DEAF facility to ensure the plan of correction was being followed, and the petitioners failed to do so." We find this assertion unsupported by anything in the record.

Rather, the "Memorandum of Understanding" reflecting the plan of correction indicates simply that DEAF would provide OHFLAC a weekly progress summary, whereupon OHFLAC would monitor the summaries and do an on-site follow up visit no later than April 28, 2006. OHFLAC "reserve[d] the right to do additional on-site visits at anytime[.]" Nothing contained within the Memorandum of Understanding or otherwise in the appendix record supports the Paynes' contention that the DHHR defendants were in any way obliged to conduct weekly inspections.

the DHHR defendants violated.[26] In short, the regulations do not require the DHHR

defendants to micro-manage the daily functions of the facilities within their regulatory

_____

[26] The nature of the Paynes' allegations fairly begs for discussion of application of qualified immunity to "discretionary" acts as opposed to "ministerial" acts—an analysis this Court nonetheless long-ago eschewed in *State v. Chase Securities, Inc.*, 188 W. Va. 356, 364, 424 S.E.2d 591, 599 (1992) ("[W]e find the discretionary-ministerial act distinction highly arbitrary and difficult to apply."). Regardless, under the limited facts of this case, we find persuasive a factually similar case which utilizes the distinction and serves to illuminate the nature of the shortcomings in the Paynes' evidence.

In *Phillips v. Thomas*, 555 So.2d 81, 86 (Ala. 1989), the Supreme Court of Alabama found the Director of the Family and Children's Services Division of the Department of Human Resources entitled to qualified immunity for allegations of negligent licensing of a day care facility and negligent training of a subordinate who conducted an inspection of the facility. The court further found, however, that the subordinate who negligently performed the inspection was not entitled to qualified immunity. *Id.*

Utilizing the discretionary/ministerial distinctions, the court explained that the Director's duties to license the facility and train subordinates "while perhaps affirmative ones, require constant decision making and judgment on the part of the supervisor or trainer." *Id.* at 85. The court acknowledged, however, that "these functions can be composed of ministerial acts, which, if performed negligently, are actionable." *Id.* The court provided the example of department guidelines which may require certain steps to be taken, which steps are not discretionary and thus a state employee's negligence with respect to those ministerial acts is actionable. *Id.* at 86. Finding an undisputed error on the inspection sheet completed by the subordinate, the court then found that the execution of the inspection itself (as opposed to any discretionary decision arising from the results thereof) was a ministerial act for which the subordinate was not entitled to qualified immunity for its negligent performance. *Id.*

This Court is well-aware of its prior criticism of the discretionary/ministerial act distinction and the questions concerning its continued vitality. Nevertheless, we find it useful in illustrating how certain governmental actions or functions may involve both discretionary and non-discretionary or ministerial aspects, the latter of which may constitute a "clearly established law of which a reasonable public official would have known." While repudiating the discretionary/ministerial distinction on the one hand, the *Chase Securities* Court made precisely this point and thereby provided useful congruity to the two concepts:
(continued . . .)

20

enforcement power to ensure constant, unwavering compliance in all aspects of their affairs.

Respondents seem to argue simply that if the DHHR defendants were doing their job properly, this incident would not have occurred. This argument was emboldened by the testimony of the WVA investigator, who despite finding no specific failures on the part of the DHHR defendants and whose activities she repeatedly denied investigating, surmised that the DHHR defendants must have been derelict in their duties, otherwise Payne's death would have been prevented. Although this overly simplistic analysis may be appealing in light of these tragic events, qualified immunity insulates the State and its agencies from liability based on vague or principled notions of government

> Application of the *Harlow* rule [requiring violation of a clearly established law of which a reasonable person would have known] will ordinarily have the same effect as the invocation of the "ministerial acts" principle followed elsewhere. Ministerial acts, by definition, are official acts which, under the law, are so well prescribed, certain, and imperative that nothing is left to the public official's discretion. Obviously, a public official who ignores or violates such clearly established precepts of the law . . . would not be entitled to qualified immunity[.]

*Id*. at 364, 424 S.E.2d at 599.

We briefly resurrect this principle for the limited purpose of providing further illustration of the Paynes' lack of evidence that the DHHR defendants violated a clearly established law. The Paynes have identified no *ministerial* duties which the DHHR defendants negligently performed. Rather, they take issue simply with the discretionary judgments which derive from the DHHR defendants' ministerial functions.

21

regulation. Requirements for stronger oversight and monitoring of facilities such as DEAF may be wise; however, it is for the Legislature to impose such requirements. Accordingly, we find that the circuit court erred in refusing to grant summary judgment to the DHHR defendants on the basis of qualified immunity as pertains to respondents' negligent monitoring and enforcement allegations.[27]

*2.     Negligent Licensing*

Although respondents' complaint is alleged exclusively in terms of the DHHR defendants' negligent failure to monitor and enforce applicable regulations at DEAF, the characterization of their claim evolved as they struggled to articulate a "clearly established" law which the DHHR defendants allegedly violated. As a result-- and primarily in their briefs before this Court--respondents argue that it was the DHHR defendants' negligent *licensure* of DEAF, and concomitant alleged violation of the licensing regulations, which are sufficient to defeat qualified immunity.[28] In particular, respondents argue that "petitioners' ongoing licensing of DEAF constituted violations [sic] of the clearly established laws governing said licensing," and that "a reasonable

---

[27] The Paynes also allege that the DHHR defendants were negligent in failing to advise clients of the prior license revocation. As with the negligent monitoring allegations, the Paynes fail to identify any "clearly established law" requiring the DHHR defendants or DEAF to notify them of any prior deficiencies.

[28] Throughout their brief when discussing the basis of their claim against the DHHR defendants, the Paynes refer almost exclusively to the "actions and inactions with respect to the continued licensing [of DEAF]," "failing to revoke [DEAF's] license," "negligently allow[ing] a license," and "negligent fail[ure] to close [DEAF]."

22

official would have known that the continual issuance of licenses to DEAF violated said regulations."

> This Court has held:
>
> > If a public officer is either authorized or required in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.

Syl. Pt. 4, *Clark*, 195 W. Va. 272, 465 S.E.2d 374. Based upon the regulations discussed in greater detail *supra*, the licensing of behavioral health facilities is a matter that has been placed entirely within the discretion of the Secretary of the DHHR.[29]

---

[29] There is no West Virginia caselaw dealing with qualified immunity as pertains to licensing activities involving a State agency, as opposed to a political subdivision. However, it is noteworthy that political subdivisions are entitled to statutory immunity under the West Virginia Tort Claims and Insurance Reform Act set forth in West Virginia Code § 29-12A-1 *et seq.* West Virginia Code § 29-12A-5(a)(9) expressly provides that political subdivisions are immune from liability for claims resulting from "[l]icensing power or functions including, but not limited to, the issuance, denial, suspension or revocation of or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authority[.]" In one the very few cases dealing with this provision, the Court explained that

> [t]he reason for establishing such immunity is readily understandable. In an era when much private conduct is subject to permitting or licensing by public bodies, absent some sort of "licensing" immunity that applies under ordinary circumstances, such public bodies could be made co-defendants in the majority of tort actions arising from the licensed or permitted private conduct.

(continued . . .)

However, respondents attempt to recast the discretionary nature of licensing functions as an affirmative, ministerial duty by attempting to utilize the deficiencies identified in the prior license revocation in March 2006 to impute prior knowledge of the particular deficiencies which were found by OFHLAC *after* Payne's death. From this leap, respondents then argue that the DHHR defendants violated their *raison d'etre* by continuing to allow DEAF to operate in spite of actual knowledge of the existence of deficiencies. However, the deficiencies identified in March 2006 were quite different in character than those identified in February 2007 as contributing to Payne's death. Additionally, the previous deficiencies spanned across a number of facilities operated by DEAF and only those prior deficiencies dealing with cleanliness were specifically directed at the West Sattes facility. More importantly, there was an intervening "plan of correction" implemented to correct the March 2006 deficiencies, and nothing in the record demonstrates that the items in the March 2006 plan of correction were not implemented to the satisfaction of the Secretary—within whose exclusive authority the determination of whether corrections have been made rests—prior to issuing the provisional or subsequent renewal license.

---

*McCormick v. Walmart Stores,* 215 W.Va. 679, 684, 600 S.E.2d 576, 581 (2004). We find that this reasoning has equal application to qualified immunity for State licensing functions.

24

Despite their contention that the DHHR defendants "knew that DEAF was not in substantial compliance with the health and safety regulations," respondents provide no evidence that the DHHR defendants were aware that any of the *particular* deficiencies identified as contributing to Payne's death existed prior to his death or even that the prior, dissimilar deficiencies continued unabated, but a license issued nevertheless.[30] Without

[30] At best, the Paynes make an untenable attempt to create a common thread of noncompliance between the March 2006 revocation and the February 2007 investigation regarding Payne's death. For example, the Paynes make much of the fact that DEAF was cited for failure to do criminal background checks on employees in the March 2006 inspection and frequently reference that Payne's direct-care worker was a former felon, who served time for armed robbery. However, in the inspection following Payne's death, DEAF was not cited for failure to perform criminal background checks. Further, nothing in the regulations prohibits an individual previously convicted of armed robbery from working at a facility. The purpose of the criminal background check is to ensure compliance with West Virginia Code of State Rules § 64-11-5.6.b: "The Center shall not employ individuals with a conviction of *consumer or child abuse or neglect.*" (emphasis added).

Moreover, the March 2006 survey contained no deficiencies regarding direct-care staff which had not been trained to care for the consumers to which they were assigned. Nor did it contain any deficiencies regarding staff without proper life-saving training. Aside from medication administration and documentation errors which occurred at the Boone County residential facility, the March 2006 survey contained no citations for failure to provide for consumers' medical needs as in Payne's case. The only deficiencies specifically attributable to the West Sattes center in March 2006 were housekeeping issues, including: supplies and equipment in the floor, dusty storage areas, windows, and ductwork, chipped paint, stained ceiling tiles, dirty kitchen equipment, potholes in the parking area, unsecured cleaning supplies, and a potential rodent issue. Although obviously not desirable conditions which, if left unabated could potentially affect the health and safety of the consumers, none of these bear any relation to the life-threatening deficiencies which gave rise to Payne's death. The only remotely corresponding, yet fairly attenuated, deficiencies between the March 2006 survey and Payne's death concern charting and documentation. *See* n.2, *supra.* However, the March 2006 survey was critical of certain technical aspects of the treatment plans reviewed including timely updates, articulation of measurable objectives, signatures, descriptions of services, and adequacy of discharge summary information, none of which were (continued . . .)

25

question, serious, life-threatening deficiencies existed at the DEAF facility in and around February 2007. There is simply no evidence that the DHHR defendants knew that those same deficiencies existed prior to its issuance of the provisional or regular renewal licenses and issued the licenses nonetheless.

Moreover, simply characterizing the regulatory power of the Secretary to revoke a license upon certain criteria as "mandatory" does not strip the *decision* to *invoke* such power of its discretionary nature.[31] To permit this action to proceed against the

---

attributable to the West Sattes center. The documentation issues identified following Payne's death (which were largely inconsistencies within the records themselves) were merely collateral to the underlying failure to provide him with a modified diet and ensure that he was cared for by properly trained staff.

[31] Although neither party assigned it as error, we find it appropriate to note the circuit court's erroneous attempt to relegate to the jury's province the determination of whether the complained of actions or inactions were discretionary—a purely legal issue which is a predicate to the qualified immunity analysis. *See Cartwright v. McComas,* 223 W. Va. 161, 164, 672 S.E.2d 297, 300 (2008) ("[I]t is within the authority of this Court to 'sua sponte, in the interest of justice, notice plain error.'"). In denying summary judgment the circuit court's order states that respondents presented "evidence which *could allow the trier of fact to determine* that the decisions made by the defendants in connection with and relating to plaintiffs' claims were not discretionary." (emphasis added). This Court has held:

> The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition.

Syl. Pt. 1, *Hutchison,* 198 W. Va. 139, 479 S.E.2d 649.

(continued . . .)

DHHR defendants on the basis of their discretionary licensing function would defeat the

entire purpose of qualified immunity as articulated by the United States Supreme Court:

> The purpose of such official immunity is not to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective litigation. The provision of immunity rests on the view that the threat of liability will make [] officials unduly timid in carrying out their official duties[.]

*Westfall v. Erwin,* 484 U.S. 292, 295 (1988). Accordingly, we likewise find that the

circuit court erred in failing to grant summary judgment to the DHHR defendants on the

basis of qualified immunity as to respondents' negligent licensure claims.

---

As such, qualified immunity by summary disposition is precluded only where there is a "bona fide dispute as to the *foundational or historical facts that underlie the immunity determination*[.]" *Id.* (emphasis added). This does not permit the court to relinquish purely legal questions—such as whether a particular government action or function is discretionary—to the jury. Whether the DHHR defendants' actions were discretionary is not a "foundational or historical fact" underlying the immunity—it is the very essence of the immunity itself. *See Chase Securities,* 188 W. Va. at 364, n.23, 424 S.E.2d at 599, n.23 ("It should thus be apparent that in a tort action against a public officer the court has the responsibility of determining [] whether he was engaged in exercising a discretionary function[.]" (quoting Restatement (Second) of Torts § 895D cmt.f)); *see also Foley v. Taylor,* 695 So.2d 1196, 1998 (Ala. App. 1997) ("Determining whether a defendant was performing a ministerial act or a discretionary act is a question of law to be decided by the trial court."); *Tolliver v. Dept. of Transp.,* 948 A.2d 1223, 1229 (Me. 2008) ("'Whether a defendant is entitled to discretionary function immunity is a question of law[.]'" (quoting *Chiu v. City of Portland*, 788 A.2d 183, 189 (Me. 2002)); *accord Berkovitz v. U. S.,* 486 U.S. 531 (1988) (holding that the court must determine whether "discretionary function" exemption to Federal Tort Claims Act applies). The circuit court below identified no "foundational or historical" facts requiring a jury's resolution before it could determine, as a matter of law, whether the complained-of actions or failures to act alleged in respondents' complaint involved discretionary functions.

## IV.  CONCLUSION

For the foregoing reasons, the November 10, 2011, order denying summary judgment is reversed, and we remand for the entry of an order granting petitioners' motion for summary judgment and dismissing the action against them.

Reversed and remanded.