IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

No. 17-0327

**FILED**
**March 25, 2019**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

DAVID BALLARD, KEVIN MCCOURT, JESS MATTOX,
AND HOBERT ALLEN,
Defendants Below, Petitioners

v.

MIGUEL ANGEL DELGADO,
Plaintiff Below, Respondent

Appeal from the Circuit Court of Kanawha County
The Honorable Joanna Tabit, Judge
Civil Action No. 15-C-1885

AFFIRMED

AND

No. 17-0328

DAVID BALLARD, KEVIN MCCOURT, JESS MATTOX,
AND HOBERT ALLEN,
Defendants Below, Petitioners

v.

MIGUEL ANGEL DELGADO,
Plaintiff Below, Respondent

---

Appeal from the Circuit Court of Kanawha County
Honorable Joanna Tabit, Judge
Civil Action No. 15-C-1885

AFFIRMED

---

Submitted: January 8, 2019
Filed: March 25, 2019

John P. Fuller, Esq.
Betsy L. Stewart, Esq.
Michael W. Taylor, Esq.
Bailey & Wyant, PLLC
Charleston, West Virginia
Counsel for the Petitioners
Kevin McCourt, Jess Mattox,
and Hobert Allen

William E. Murray, Esq.
Natalie N. Matheny, Esq.
Anspach Meeks Ellenberger LLP
Charleston, West Virginia
Counsel for the Petitioner David Ballard

Lydia C. Milnes, Esq.
Mountain State Justice, Inc.
Clarksburg, West Virginia
Counsel for the Respondent

JUSTICE WORKMAN delivered the Opinion of the Court.
JUSTICE JENKINS dissents and reserves the right to file a dissenting opinion.

**SYLLABUS BY THE COURT**

1. "A circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine." Syl. Pt. 2, *Robinson v. Pack*, 223 W.Va. 828, 679 S.E.2d 660 (2009).

2. "This Court reviews de novo the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002).

3. "The circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." Syl. Pt. 3, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

4. "The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition." Syl. Pt. 1, *Hutchison v. City of Huntington*, 198 W.Va. 139, 479 S.E.2d 649 (1996).

5. "A circuit court's order denying summary judgment on qualified immunity grounds on the basis of disputed issues of material fact must contain sufficient detail to permit meaningful appellate review. In particular, the court must identify those material facts which are disputed by competent evidence and must provide a description of the competing evidence or inferences therefrom giving rise to the dispute which preclude summary disposition." Syl. Pt. 4, *W.Va. Dep't of Health & Human Res. v. Payne*, 231 W.Va. 563, 746 S.E.2d 554 (2013).

6. "'On a motion for summary judgment all papers of record and all matters submitted by both parties should be considered by the court.' Syl. Pt. 2, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of NY*, 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syl. Pt. 3, *Ford v. Dickerson*, 222 W.Va. 61, 662 S.E.2d 503 (2008).

WORKMAN, Justice:

In these consolidated appeals, the petitioners (defendants below), David Ballard, Warden at Mount Olive Correction Center ("MOCC"),[1] and Kevin McCourt, Jess Mattox, and Hobert Allen, correctional officers at MOCC (collectively the "petitioners"), appeal the Circuit Court of Kanawha County's March 9, 2017, order through which it denied their motions for summary judgment based on qualified immunity in this excessive force action brought under 42 United States Code §1983 (2012)[2] ("§ 1983"). The circuit court found that the petitioners were not entitled to summary judgment because there are genuine issues of material fact concerning the excessive force, deliberate indifference, and supervisory liability claims brought against them by the respondent (plaintiff below), Miguel Delgado, an inmate at MOCC ("Inmate Delgado"). The circuit court further found that if it

_____

[1] Effective July 1, 2018, the correctional facility positions formerly designated as "wardens" are now designated "superintendents." *See* W.Va. Code § 15A-5-3 (2018 Supp.). Mr. Ballard is no longer the superintendent at MOCC, however, he held the title of "warden" at MOCC at all times relevant to the case at bar. Accordingly, we refer to Mr. Ballard herein as "Warden Ballard."

[2] *See* 42 U.S.C. § 1983, in part ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .").

1

is ultimately determined that the petitioner officers violated the Eighth Amendment[3] through use of excessive force and deliberate indifference, Inmate Delgado's tort claims were also viable. Following our review of the briefs, the arguments of counsel, the appendix record submitted, and the applicable law, this Court finds no reversible error and affirms the circuit court's denial of summary judgment based on qualified immunity grounds.

### I. Facts and Procedural Background[4]

Shortly before midnight on May 23, 2015, Nurse Joyce Coleman, accompanied by Officers McCourt and Brandon Mooney,[5] was distributing medications to prisoners in the Quilliams II Unit ("Unit"), a segregation unit at MOCC, which is a state correctional facility located in Mt. Olive, West Virginia.[6] Medications are dispensed to inmates through what is sometimes referred to as a "bean hole," which is a narrow slot in the solid steel cell doors through which food trays and medications are passed. Inmate Delgado alleges that during

---

[3] U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

[4] These factual allegations have been gleaned from the parties' briefs and the appendix record, which includes a partial transcript of Warden Ballard's deposition testimony taken on June 10, 2016, in a federal action brought by an MOCC inmate, as well as a transcript of Inmate Delgado's deposition taken in the instant action.

[5] Officer Mooney is not a party to this action. There is some indication in the appendix record that he died before this action was brought.

[6] The Quilliams II Unit is a solitary confinement unit that houses inmates who have been placed on administrative segregation. The parties sometime refer to the Unit as a "pod."

2

this particular "pill pass," he repeatedly told Nurse Coleman that he had a question. When she did not respond, he asked Officer McCourt, one of the officers accompanying Nurse Coleman, to tell the nurse that he had a question. Inmate Delgado states that Nurse Coleman then approached his cell door and asked, "What is it? I'm busy." He responded that he had a question to which she replied she was busy dealing with a thousand other inmates. According to Inmate Delgado, after further discussion with Nurse Coleman, he became frustrated and threatened to report her to the board of nursing, prompting her to shout the address of the nursing board through his cell door. Inmate Delgado replied that he already had the board's address, adding "if you don't care, quit your job, go home, and kill yourself." Officer McCourt interjected, warning Inmate Delgado that he was getting close to a "write-up,"[7] Delgado responded, "listen, I don't care. You go home too and kill yourself." The officers and Nurse Coleman then left his cell door to complete the pill pass, after which they exited the Unit.

Inmate Delgado alleges that after Nurse Coleman and the officers left his cell door, he lay down on his bed, put on his headphones, and listened to music. He states that approximately ten minutes later, Officers McCourt, Mooney, and Maddox returned to his cell door to re-engage with him. He contends that Officer Mooney told him that he was "tired of my smart mouth and my attitude with the nurses," that they were "fed up with it," and that

---

[7] A "write-up" appears to be a disciplinary report that is filed against an inmate.

I was "going to get a write-up." Inmate Delgado responded, "[w]rite it up, write it up," after which Officer Mooney said, "you got a smart mouth. I'm going to spray you[,]" referring to Oleoresin Capsicum pepper spray ("OC").[8] Inmate Delgado avers that he replied, "[g]o ahead, spray me. If that's what you want to do, go ahead and spray me." He then spun around to place his lower back against the slot in his cell door to try to block the spray from dispersing throughout his cell.[9] He states that he was not quick enough, and the first spray[10] went along the wall of his cell; however, the second spray struck his lower back, soaking his clothing. Inmate Delgado contends that the rest of the Unit was quiet during this entire incident and that the only disturbance was the one created by the correctional officers.

Upon being sprayed with OC, Inmate Delgado states that he immediately began to suffer from burning eyes and skin and restricted airways causing him to feel as if he could not breathe. After deploying the OC spray, the officers closed the slot in the cell door and departed. Inmate Delgado used the sink in his cell to splash water on his face and hands in an attempt to lessen the burning effects of the OC spray but, within minutes, the officers shut

---

[8] In written post-incident reports, the officers state that the spray they used on Inmate Delgado was MK-9 Sabre Red Phantom OC, also referred to as "Mark IX."

[9] Apparently, Inmate Delgado had prior experience upon which to base his evasive efforts as he had been sprayed with OC spray while locked in his solitary confinement cell on five occasions.

[10] Inmate Delgado learned through his administrative grievance concerning this incident that it was Officer McCourt who deployed the OC spray into his cell.

4

off the water to his cell. Inmate Delgado states that when he asked why his water had been shut off, Officer Allen told him they had done it "so you won't decontaminate yourself." Approximately ten minutes later, Officers McCourt, Allen, and Mattox returned to Inmate Delgado's cell to take him to the recreation yard for decontamination. Inmate Delgado testified that his hands were cuffed behind his back in a twisting fashion that caused him so much pain in his shoulder that he fell to his knees while the officers simultaneously disregarded his protestations that they were hurting him. Other than an inmate yelling to ask why his water had been shut off,[11] Inmate Delgado states that the rest of the Unit continued to remain quiet.

Once they arrived in the recreation yard, Inmate Delgado states that Officer Allen turned on the water in a large sink. When he asked how the decontamination would proceed when he could not remove his clothing that was soaked with OC spray as he was handcuffed, he contends that Officer Allen accused him of refusing decontamination. Another officer told Inmate Delgado to go ahead and remove his clothing, but refused to remove his handcuffs, at which point the officers again accused him of refusing decontamination. Thereafter, Inmate Delgado was taken to see Nurse Coleman for a medical evaluation.

---

[11] Inmate Delgado explained that his cell in the Unit was connected to three other cells with two on the bottom and two cells above. When the officers shut off the water to his cell, it was shut off to all four cells.

5

Inmate Delgado states that he was seated at a table in a multipurpose room with Officers Mattox and Allen on either side of him when Nurse Coleman approached him, asking him what was wrong. He told her about his shoulder pain caused by the officers twisting his arm and wrist at an awkward angle before cuffing him and that his buttocks and back were on fire because of the pepper spray. Inmate Delgado alleges that Nurse Coleman neither touched nor examined him but, instead, walked to the other side of the table, sat down, and began reading a book.[12] Approximately one hour after the OC spray was deployed into his locked isolation cell, Inmate Delgado was allowed to shower. He was then returned to his cell, which had been decontaminated.

Offering a different account of these events, Officers McCourt and Mooney filed incident reports in which they stated that Inmate Delgado became verbally combative with Nurse Coleman, telling her to "go kill yourself," but also threatening, "im [sic] going to kill you bitch," the latter of which Inmate Delgado denies. These officers also reported that Inmate Delgado told them "fuck you CO"[13] as they escorted Nurse Coleman away from his cell following his verbal exchange with her. As for their reason for later returning to Inmate Delgado's cell, these officers reported that they did so to attempt to "deescalate" or "calm" him. According to the reports of the petitioner officers and Officer Mooney, Inmate

---

[12] Inmate Delgado did not name Nurse Coleman as a defendant in this action.

[13] Presumably "CO" is used to refer to the correctional officers.

6

Delgado ignored their multiple, loud, and clear verbal commands to cease creating a disturbance[14] that was spreading to other inmates who were yelling from within their locked cells in the Unit, which prompted Officer Mooney to open the slot in Inmate Delgado's locked cell door through which Officer McCourt deployed "two one second burst[s]" of OC spray into the cell. The officers state this "very low level" use of force was utilized to gain Inmate Delgado's compliance and restore order to the Unit.[15] Regarding the water being turned off to Inmate Delgado's cell after the OC spray was deployed, Officer McCourt stated in his Incident Report that Officers Mooney and Mattox turned off the water "[i]n order to allow [Delgado] to deescalate[.]" Officer Mattox stated in his Incident Report that the water

---

[14] The Incident Report filed by Officer Mooney stated that Inmate Delgado was "continuously yelling and cursing." Officer Mattox stated in his Incident Report that Inmate Delgado was "highly agitated, yelling and cursing at Officers Mooney and McCourt" and that other inmates in the Unit were beginning to yell. Officer McCourt indicated in his Incident Report that Inmate Delgado was "creating a disturbance" and that "other inmates in the [Unit] began to yell."

[15] The appendix record contains a copy of the West Virginia Division of Corrections Policy Directive 312.02 ("DOC Policy Directive 312.02"), which sets forth a Force Continuum. The Intermediate Control Tactics Soft provides that it is "a level of control used for any level of resistance by an inmate when lower levels of control have failed" and that this level of control "may include . . . personally carried chemical agent[.]" This Policy Directive further provides that such chemical agent "must be employed in the manner as set forth in the manufacturer's recommendations" because "[a]ny deviation from those requirements may increase the potential for injury[.]" The appendix record also contains a copy of the instruction label for the particular OC used against Delgado. *See supra* note 8. These instructions provide that the OC should not be discharged at distances of fewer than six feet from the intended target because exposure in a closer range can cause damage to soft body tissue, in addition to being a skin, eye, and respiratory irritant, and that decontamination should begin "as soon as possible" after restraining the inmate.

7

was shut off "due to Inmate Delgado's prior history to prevent him from flooding his cell and unit."

The petitioner officers further allege that approximately ten minutes after the OC spray was deployed, Inmate Delgado was placed in mechanical wrist restraints and removed from his cell at which point leg restraints were also applied. He was escorted by Officers Mattox and Mooney to the recreation yard for decontamination where they contend he refused decontamination. Next, Inmate Delgado was taken for medical assessment by Nurse Coleman. Officer Mattox stated in his Incident Report that "[d]uring the medical assessment, there were no injuries to be noted for Inmate Delgado[.]" Officer Allen stated in a memorandum that Inmate Delgado was "medically assessed by LPN Joyce Coleman." Similarly, a confidential Use of Force Committee Report to Warden Ballard states that Inmate Delgado "was medically assessed by LPN Coleman and medically cleared to return to his cell." Inconsistent with these reports, Nurse Coleman, the individual who was to have performed this medical assessment, stated in her Incident Report that Inmate Delgado refused medical assessment.

Following Inmate Delgado's exhaustion of his administrative remedies concerning this incident, he filed the instant action against the petitioners seeking monetary damages, as well as injunctive relief. *See* 42 U.S.C. § 1983. He asserted violations of his

8

federal constitutional rights,[16] including allegations that the correctional officers used excessive force against him in violation of the Eighth Amendment. More specifically, Inmate Delgado alleged that Officer McCourt violated his "constitutional rights to safety . . . and to be free from cruel and unusual punishment by indiscriminately utilizing . . . OC pepper spray, through excessive and nontrivial force against [him], as a sadistic and malicious form of punishment, rather than adhering to clearly established law, [and] proper disciplinary procedures[.]" He alleged the petitioner officers were "deliberately indifferent to [his] medical need for decontamination in a manner that caused [him] an unnecessary and wanton infliction of pain." A claim of assault and battery was also asserted against Officer McCourt and intentional infliction of emotional distress against the petitioner officers.

In addition, Inmate Delgado asserted a claim of supervisory liability against Warden Ballard.[17] He alleged that Warden Ballard's actions violated his constitutional rights through his promulgation and implementation of policies and internal orders that exposed him and other inmates confined in the segregation units at MOCC "to unnecessary and

---

[16] Delgado also asserted claims under the Fourteenth Amendment of the United States Constitution and the West Virginia Constitution, which he voluntarily dismissed.

[17] The circuit court found that Inmate Delgado's claims seeking prospective injunctive relief against Warden Ballard in his official capacity were not subject to a qualified immunity analysis and, therefore, "summary judgment based on qualified immunity [did] not apply to those claims." *See Camreta v. Greene*, 563 U.S. 692, 706 n.5 (2011) (qualified immunity unavailable in actions to enjoin future conduct). This ruling is not a subject of this appeal.

9

unreasonable uses of force when such uses of force were not justified, but rather administered as wanton forms of punishment." In support of this claim, Inmate Delgado's evidence included: (1) an inmate's inquiry concerning whether there was "martial law" in the Quilliams Units and an MOCC lieutenant's written response that stated: "PER WARDEN, MARTIAL LAW IS A CONDITION THAT MOCC UTILIZES[;]" (2) an MOCC major's email to prison administrators and employees on which Warden Ballard was copied and which advised that officers "do not have to give efforts to temper to those locked up in our Seg units[;]" (3) the testimony of an MOCC correctional officer during a disciplinary hearing that "there's martial law going on right now" and that "they told me that came from the Warden[;]" and the deposition testimony of Warden Ballard in which he confirmed that "efforts to temper are not required in the segregation . . . units." Also, Inmate Delgado testified during his deposition to having heard correctional officers discuss martial law in the Quilliams Units, explaining it was his

> understanding from what the officers say, the paperwork I've seen, say we were under Martial Law and that we could be sprayed for any reason or for no reason at all. And that there was a memo that I read that the staff working in Quilliams did not need to temper their efforts of a forceful response meaning that we were - - we could be victimized by the officers at any time. That there was nothing we could do about it.

Inmate Delgado further testified that he and many other inmates in the segregation units were regularly subjected to the use of OC spray for minor infractions, such as yelling through the doors of their locked isolation cells. He maintains that the subject incident exemplifies how

10

correctional officers implemented this policy of martial law "and/or the suspension of the requirement that officers should make 'efforts to temper' the use of force against inmates on the isolation units."

In further support of his supervisory liability claim, Inmate Delgado alleged in his complaint, inter alia, that Warden Ballard's directive not to give efforts to temper "was in direct violation of clearly established law";[18] that it was objectively unreasonable and an "unawarranted invasion" upon his clearly established rights under the Eighth Amendment; that the MOCC policy of martial law, which permits any level of force to be used without efforts to temper, creates a "pervasive and unreasonable risk that inmates, including [himself], will be maliciously and sadistically harmed by the use of force for the purpose of punishment and without regard for the need for force;" and that Warden Ballard had actual and constructive knowledge of the numerous incidents of excessive force in the segregation units, had approved policies and practices of martial law, and then acted with deliberate indifference through his failure to stop the abusive and excessive uses of force.

---

[18] *See Whitley v. Albers*, 475 U.S. 312, 321 (1986) (establishing standard for evaluating Eighth Amendment excessive force claims arising out of prison situations and directing courts to consider, inter alia, whether correctional officers made "any efforts [] *to temper* the severity of a forceful response" in determining whether force used was excessive) (emphasis added).

The petitioners filed motions for summary judgment in which they asserted entitlement to qualified immunity from Inmate Delgado's claims. Inmate Delgado filed responses in opposition to the motions. During the final pretrial conference, the circuit court fully entertained counsels' arguments on these dispositive motions. The hearing transcript reveals that the circuit court asked counsel several questions during the course of the hearing concerning the parties' conflicting factual accounts. The circuit court also confirmed its understanding of the petitioner officers' arguments, asking: "[Y]ou're arguing that your clients are entitled to qualified immunity, that these were discretionary actions, and that they did this in good faith, and that there's no violation of clearly established laws as it relates to any actions that they took?" The correctional officers' counsel responded in the affirmative. After hearing the arguments of counsel, the circuit court stated:

> [U]nder the circumstances, I do believe that there are genuine issues of material fact as to whether or not there was excessive force.
>
> . . . .
>
> I think there are issues . . . when you look at the _Whitley_[19] factors to the need for the application of the force, the relationship between that need and the amount of force used, and, frankly, the threat reasonably perceived by the officials.
>
> . . . .

---

[19] In _Whitley v. Albers_, 475 U.S. 312 (1986), the Supreme Court established the standard for evaluating Eighth Amendment excessive force claims in the context of prisons, as discussed more fully _infra_.

> And I just think it's appropriate to let those issues go before the jury, and I do believe that the remaining tort claims flow from that. I think that they're factual issues, so they'll go to the jury[.]

(Footnote added). The circuit court also concluded during the hearing that there were disputed facts related to the supervisory liability claim against Warden Ballard, observing that if evidence was not elicited as Inmate Delgado's counsel anticipates, the court would "do the appropriate thing at the directed verdict stage."

The circuit court directed Inmate Delgado's counsel to prepare an order denying the summary judgment motions. Counsel did so, submitting a proposed order to which the petitioners objected.[20] Over those objections, the circuit court entered a seventeen-page order on March 6, 2017, denying the petitioners' motions for summary judgment based on qualified immunity. The circuit court found that summary judgment was improper because the resolution of the immunity and the substantive claims were dependent upon a determination of conflicting evidence. This appeal followed.

## II. Standard of Review

We are asked to determine whether the circuit court erred in denying summary judgment to the petitioners based on their assertion of qualified immunity. While the denial

---

[20] The petitioners filed a joint motion for rehearing.

13

of summary judgment is generally not subject to appellate review, we have carved out an exception, holding that "[a] circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine." Syl. Pt. 2, *Robinson v. Pack*, 223 W.Va. 828, 679 S.E.2d 660 (2009). Further, "[t]his Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002). In conducting our de novo review, we "must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion." *Painter v. Peavy*, 192 W.Va. 189, 192, 451 S.E.2d 755, 758 (1994) (citations omitted). This matter being properly before us, the parties' arguments will be considered against this plenary standard.

## III.  Discussion

In addition to challenging the denial of their dispositive motions based on qualified immunity, the petitioners also challenge the circuit court's order denying summary judgment as being deficient and unsupported by the record. We consider each of these issues, in turn, below.

### A.  Qualified Immunity

Inmate Delgado asserts, and the petitioners do not dispute, that federal law controls our analysis because the claims to which qualified immunity are being asserted arise

14

under federal law. Our case law makes clear this Court's "approach to matters concerning immunity historically has followed federal law due in large part to the need for a uniform standard when, as in the case before us, public officers are sued in state court for violations of federal civil rights pursuant to 42 U.S.C. § 1983." *City of Saint Albans v. Botkins*, 228 W.Va. 393, 398, 719 S.E.2d 863, 868 (2011); *see also Robinson*, 223 W.Va. at 834, 769 S.E.2d at 666 (citation omitted) ("federal law is controlling when public officials are sued in state court for violations of federal rights under 42 U.S.C. § 1983"). As we earlier explained in *State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992),

> [a]nother reason for utilizing the federal law is the holding in *Howlett v. Rose*, 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990), that in Section 1983 litigation a state may not create an immunity for state officials that is greater than the federal immunity. The Court in *Howlett* pointed out that Section 1983 suits could be brought in state courts and that under the Supremacy Clause, federal substantive law must be applied in such actions.

*Chase Sec., Inc.*, 188 W.Va. at 359, 424 S.E.2d at 594 (footnote omitted); *accord W.Va. Reg'l Jail and Corr. Facility Auth. v. A.B.*, 234 W.Va. 492, 504 n.13, 766 S.E.2d 751, 763 n.13 (2014) (citations omitted) (explaining that "nothing herein serves to supplant the federal § 1983 jurisprudence regarding immunity or actionable claims thereunder inasmuch as 'in Section 1983 litigation a state may not create an immunity for state officials that is greater than the federal immunity.'"); *see also Howlett*, 496 U.S. 356 (observing that states may not create immunity greater than federal immunity in § 1983 litigation brought in state courts); *Hutchison v. City of Huntington*, 198 W.Va. 139, 152 n.17, 479 S.E.2d 649, 662 n.17 (1996)

15

("[S]tate immunity laws are not applicable to § 1983 actions."). Accordingly, federal law will guide our analysis in determining whether the circuit court erred in denying summary judgment to the petitioners based on their assertion of qualified immunity.

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court of the United States addressed qualified immunity, holding that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* 818. The Supreme Court has crafted a two-part test for courts to apply in ruling on a qualified immunity issue. The first inquiry is, when"[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If answered in the affirmative, then the second inquiry is "whether the right was clearly established[?]"[21] *Id.*

---

[21] While these *Saucier* considerations remain in tact, the Supreme Court receded from the order of this two-part analysis in *Pearson v. Callahan*, 555 U.S. 223 (2009). Trial courts now have the discretion regarding the order in which these two inquiries are considered. *Id.* at 236.

### i. Eighth Amendment Excessive Force Claims
### Against the Petitioner Correctional Officers

The petitioner officers assert entitlement to qualified immunity concerning Inmate Delgado's excessive force claims. In this regard,

> [t]he ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition.

*Hutchison*, 198 W.Va. at 144, 479 S.E.2d at 654, syl. pt. 1. Under this standard, the petitioner officers contend they are entitled summary judgment based on qualified immunity because they did not violate any clearly established constitutional rights. They argue that their use of OC spray against Inmate Delgado was a discretionary act in response to his refusal to comply with their clear verbal commands to stop creating a disturbance that was spreading to other cells in the Unit. More specifically, they assert that Officer McCourt engaged in a discretionary function within his duties as a correctional officer when he deployed OC spray into Inmate Delgado's locked, solitary cell, and that such use is approved as an "Intermediate Control Tactics Soft."[22] Arguing further, the petitioner officers state that "[p]rison officials do not violate the U.S. Const. Amend. VIII whenever it appears in retrospect that the infliction of pain during a security measure could theoretically have been avoided" and that the question "ultimately turns on 'whether force was applied in a good

---

[22] *See supra* note 15.

17

faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Whitley v. Albers,* 475 U.S. 312, 320-21 (1986) (citation omitted).

Conversely, Inmate Delgado argues in support of the circuit court's determination that genuine issues of material fact exist concerning his claim of excessive force where the officers' version of events is directly contradicted by him and where he offered evidence of prison policies and directives that may have contributed to the alleged use of excessive force. Rather than a discretionary measure employed when he allegedly failed to conform to the petitioner officers' verbal commands, Inmate Delgado denies being given any specific directives by the officers. Instead, he contends that he was sprayed solely in retaliation for his admittedly rude comments to Nurse Coleman and with a malicious intent to cause him pain, which violates his Eighth Amendment rights. He reports that Officer Mooney told him that he was "tired of his smart mouth and attitude with the nurses" and that "they were fed up with it" immediately prior to the OC being sprayed into his locked cell. He further claims the officers intentionally failed to properly decontaminate him for approximately one hour thereafter.

Under a qualified immunity analysis, we must determine whether the petitioner officers' alleged conduct violated a clearly established constitutional right. *Harlow*, 457 U.S.

18

at 818; *Saucier*, 533 U.S. at 201.  More specific to the instant mater, we must determine whether their use of OC spray against Inmate Delgado violated his right under the Eighth Amendment,[23] which "protects inmates from inhumane treatment and conditions while imprisoned."  *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).  "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause[.]"  *Whitley*, 475 U.S. at 319.

In this regard, the Fourth Circuit "held over a decade ago that '[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary *or for the sole purpose of infliction of pain*.'"  *Iko v. Shreve*, 535 F.3d 225, 235 (4th Cir. 2008) (emphasis added) (citation omitted); *see also Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) ("It has long been established that prison officials violate the Eighth Amendment by using 'mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain'") (citation omitted).  Accordingly, Inmate Delgado's right to be free from excessive force through the use of OC spray *in a manner that violates the Eighth Amendment* was clearly established for purposes of a qualified immunity analysis.  *See Saucier*, 533 U.S. at 201.

---

[23] *See supra* note 3.

19

In determining whether the petitioner officers' deployment of OC spray against Inmate Delgado constituted excessive force, we must examine the claim under subjective (state of mind) and objective (seriousness of injury or deprivation) components. *Id.* at 238. While the state of mind required in excessive force claims is "wantonness in the infliction of pain[,]" *Whitley*, 475 U.S. at 322, the "'core judicial inquiry' regarding the subjective component of an excessive force claim is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Iko*, 535 F.3d at 239 (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

In *Whitley*, the United States Supreme Court discussed the factors to be considered in conducting this core judicial inquiry in the recognition of the deference afforded to prison administrators in the adoption of policies and practices that they determined to be necessary to maintain discipline and institutional security. To that end, the Supreme Court set forth factors to consider in excessive force claims, which were later summarized in *Iko*, as follows:

> The Supreme Court has set forth four non-exclusive factors to assist courts in assessing whether an officer has acted with "wantonness": (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321, 106 S.Ct. 1078 (internal quotations omitted) (applying these factors in a prison riot case)[.]

20

*Iko*, 535 F.3d at 239. At the time *Iko* was decided, the United States Supreme Court had already extended these *Whitley* factors beyond prison riots to all allegations of excessive force. *See Hudson*, 503 U.S. at 6-7 ("[W]e hold that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."); *see also Mann v. Scott*, No. 0:14-3474-RMG, 2015 WL 5165198, at *5 (D.S.C. Sept. 1, 2015) ("Use of chemical munitions on prisoners may or may not constitute excessive force, and the *Whitley* factors depend on the circumstances surrounding the application of the chemical munitions and any treatment and decontamination following.").

While it is clear from the authorities discussed herein that the use of chemical agents can constitute excessive force, the petitioner officers argue that under the four *Whitley* factors recounted above, their use of OC spray in this instance did not constitute excessive force. They assert that the need for the use of force, the first *Whitley* factor, occurred when Inmate Delgado ignored their clear verbal commands to stop creating a disturbance. Regarding the second *Whitley* factor, they argue that the amount of force used was appropriate to the need, as it was a low level of force employed to restore order to the Unit. They maintain that the third *Whitley* factor was likewise met because Inmate Delgado's yelling and cursing, even from within his locked isolation cell, was spreading throughout the

21

Unit, which can escalate to the kicking of cell doors and can threaten prison security. They contend the fourth *Whitley* factor is equally met where they first endeavored to gain Inmate Delgado's compliance with verbal commands.

Conversely, Inmate Delgado argues that the officers' conduct fails on all four *Whitley* factors. He insists there was no need for any use of force because he was not posing a threat to anyone nor was there any threat to prison security. He states that he was alone in his locked isolation cell, lying on his bed wearing his headphones and listening to music when the officers returned to his cell door to re-engage with him. He maintains the entire Unit was quiet at that time, other than the disturbance being created by the officers, and that he did not ignore clear verbal commands because none were given. *Cf. Tedder v. Johnson*, 527 F. App'x 269 (4th Cir. 2013) (reversing award of summary judgment in favor of defendants on inmate's excessive force claim where officer pepper sprayed inmate for failing to obey order when inmate posed no threat and was complying).[24] Further, regarding whether the officers deployed the OC spray against him in retaliation and punishment for his earlier comments to Nurse Coleman, Inmate Delgado testified that Officer Mooney told him immediately before the OC spray was deployed that he was tired of his "'smart mouth and attitude with the nurses'" and "'they were fed up with it." *See id.* at 273 (reversing award

---

[24] On remand, the jury found in favor of inmate Tedder, which was upheld in *Tedder v. Johnson*, 583 F. App'x 276 (4th Cir. 2014).

22

of summary judgment on inmate's excessive force claim where officer's verbal statements showed malicious intent); *Orem v. Rephann*, 523 F.3d 442, 447 (4th Cir. 2008), *abrogated on other grounds by Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 89 (4th Cir. 2016) (observing that evidence of defendant's motives is relevant to subjective component of excessive force claim).

Turning to the objective component of an excessive force claim, which looks to the deprivation suffered or injury inflicted, the *Iko* court explained that "[a]n injury is sufficiently serious for purposes of the objective component of an Eighth Amendment excessive force claim as long as it rises above the level of de minimus harm. *Hudson*, 503 U.S. at 9-10, 112 S.Ct. 995 (rejecting argument that 'minor' injuries are not actionable)." *Iko*, 535 F.3d at 238; *see also Hudson*, 503 U.S. at 13 (Blackmun, J., concurring in the judgment) ("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' *e.g.*, injury that requires medical attention or leaves permanent marks"). Hence, the focus is "not on the severity of any injuries inflicted, but rather on 'the nature of the force, which must be 'nontrivial.'" *Tedder*, 527 F. App'x at 272 (quoting *Wilkins v. Gaddy*, 559 U.S. 34 (2010)). As the court in *Tedder* found, "Tedder's adverse physical reaction to the pepper spray–gagging, breathing difficulty, and vomiting–establishes that the nature of the force . . . was nontrivial." *Tedder*, 527 F. App'x

23

at 274.  Likewise, in *Harper v. Blagg*, No. 2:13-cv-19796, 2015 WL 6509131 (S.D. W.Va. Oct. 28, 2015), the federal district court observed that "[c]ourts previously found that similar adverse physical reactions to pepper spray or other chemical munitions were sufficient to create genuine issues of material fact as to the objective inquiry of an excessive force claim." *Id.* at *12; *see also  Blount v. Farmer*, No. 7:14CV00418, 2015 WL 4404810, at *3 (W.D. Va. July 17, 2015) (denying correctional officer's motion for summary judgment on objective inquiry of excessive force claim where inmate alleged pepper spray caused "coughing, sneezing, excessive mucus, and a painful burning sensation on his skin that lasted for a whole day.").  Here, Inmate Delgado alleges that his eyes and skin burned and his airways were so restricted that he felt as if he could not breathe following the deployment of OC spray against him, which symptoms are akin to those in *Tedder* and *Harper*.  He further alleges mental and emotional distress and humiliation, which are similar to the inmate's additional allegations in *Harper.*

While the petitioners do not challenge the physical reactions caused by the deployment of OC spray, they argue that Inmate Delgado's injuries were insufficient to rise to the level of an Eighth Amendment violation under the objective component of the excessive force analysis.  Certainly, not "every malevolent touch by a prison guard gives rise to a federal cause of action. See *Johnson v. Glick*, 481 F.2d, at 1033 ('Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a

24

prisoner's constitutional rights').'" *Hudson*, 503 U.S. at 9. We nonetheless also recognize

that "'[t]he use of excessive physical force against a prisoner may constitute cruel and

unusual punishment [*even*] *when the inmate does not suffer serious injury*.'" *Wilkins*, 559

U.S. at 34 (citation omitted) (emphasis added). Moreover, as the Supreme Court of the

United States has explained,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. See *Whitley*, *supra*, at 327. This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today.

*Hudson*, 503 U.S. at 9.

While we express no view on the merits of Inmate Delgado's claims and

understand that a purpose of qualified immunity is to eliminate the burden of defending

against a meritless claim,[25] summary judgment is only appropriate if "there is no genuine

issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of

law." W.Va. R. Civ. P. 56(c). We must draw "any permissible inference from the underlying

---

[25] *See Matson v. Wagner*, 236 W.Va. 488, 500, 781 S.E.2d 936, 948 (2015) ("[Q]ualified immunity is more than a defense to liability because, in many cases, it confers upon governmental bodies and public officials the right not to be subject to the burden of trial at all. The very heart of qualified immunity is that it spares the defendant from having to go forward with an inquiry into the merits of the case.").

25

facts in the light most favorable to the party opposing the motion." *Painter*, 192 W.Va. at 192, 451 S.E.2d at 758. "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007).[26] In doing so, we find there are genuine issues of material fact that precluded awarding summary judgment based on qualified immunity to the petitioner officers. *See, e.g., Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992) ("If there are genuine issues of historical fact respecting the officer's conduct or its reasonableness under the circumstances, summary judgment is not appropriate, and the issue must be reserved for trial."). These material issues of fact permeate both the subjective and objective components of this excessive force claim.

---

[26] Other courts have denied summary judgment, finding that inmate's version of events, which was provided in his or her own deposition testimony, created material issues of fact and credibility issues to be determined by a jury. *See, e.g., Skelly v. Okalossa Cty. Bd. of Cty. Comm'rs*, 415 F. App'x 153, 155 (11th Cir. 2011) (vacating district court's award of summary judgment to defendants and finding plaintiff's deposition testimony not "so fantastic or internally inconsistent that no reasonable jury could credit it"; that "this is the classic case of the plaintiff swearing to one set of facts and the defendants swearing to another set of facts"; that plaintiff's testimony directly contradicts officers' version of events; and concluding it "is up to the jury to determine whom to believe and what actually transpired"); *Galberth v. Durkin*, No. 9:14-CV-115, 2017 WL 4326076, *8 (N.D.N.Y. Sept. 27, 2017) (citation omitted) (adopting magistrate's recommended findings and decision to deny summary judgment and which observed that plaintiff's excessive force claims relied almost exclusively on his own deposition testimony; that rational jury could credit plaintiff's description of alleged assaults by correctional officers; that "although plaintiff's inconsistencies provide 'ammunition for cross-examination,' they do not provide a basis for this court to recommend dismissal of his excessive force claims as a matter of law"; and setting forth string cite of other cases where plaintiff's account of events was sufficient to withstand summary judgment).

26

Under the objective component, there are genuine issues of material fact concerning the seriousness of Inmate Delgado's injuries. Regarding the subjective component, there are genuine issues of material fact regarding whether the petitioner officers' use of force was necessary and whether the amount of force used was necessary to the need (the first and second *Whitley* factors); whether Inmate Delgado was presenting any reasonably perceived threat at the time the OC spray was used against him (the third *Whitley* factor); and whether any efforts were made to temper the severity of their forceful response (the fourth *Whitley* factor). *See Whitley*, 475 U.S. at 320-21

We find compelling support for our conclusion in the similar excessive force claims brought in federal court by other inmates housed in the segregation units at MOCC in which dispositive motions based on qualified immunity were denied. For example, in *Smith v. Hypes*, No. 2:14-cv-17001, 2017 WL 1016982 (S.D. W.Va. Feb. 21, 2017), the magistrate judge recommended denying a correctional officer's motion for summary judgment based on qualified immunity in an excessive force action brought by an inmate housed in a segregation unit at MOCC. The magistrate concluded, after considering the evidence in the light most favorable to the inmate, that "a reasonable officer should have known that pepper spraying an inmate who had previously, but was not currently . . . creating a disturbance . . . could be construed as malicious and sadistic punishment and not an action

27

done in a good faith effort to restore order." *Id.* at \*10.[27] There are other cases where the United States District Court for the Southern District of West Virginia has denied summary judgment in excessive force actions brought by other inmates housed in the segregation units at MOCC against Warden Ballard and various correctional officers arising out of being sprayed with OC as a result of alleged prison policies and directives. *See Harper v. Barbagallo*, No. 2:14-cv-07529, 2016 WL 5419442 (S.D. W.Va. Sept. 27, 2016) (denying motions to dismiss based on qualified immunity on excessive force and supervisory liability claims where inmate alleged he was sprayed with OC through the food slot in his locked cell door for insulting officer in MOCC segregation units); *Cantrell v. Ballard*, 2016 WL 5660339 (S.D. W.Va. Sept. 29, 2016) (adopting magistrate's proposed findings and recommendation denying motion for summary judgment based on qualified immunity finding genuine issues of material fact on claims of excessive force and supervisory liability where inmate was sprayed with OC for allegedly kicking cell door while alone in his locked cell in MOCC segregation unit and for incident involving his placement in restraint chair); *Douty v. Rubenstein*, No. 2:13-32832, 2016 WL 11481145 (S.D. W.Va. Apr. 27, 2016) (magistrate's proposed findings and recommendation to deny summary judgment based on qualified immunity finding genuine issues of material fact concerning the *Whitley* factors where inmate was sprayed with OC for allegedly yelling profanities at officers and creating

---

[27] *See Hypes*, 2017 WL 988118 (S.D. W.Va. Mar. 14, 2017) (adopting magistrate's proposed findings and recommendation).

a volatile atmosphere while locked alone in his segregation cell at MOCC);[28] *Harper v. Blagg*, No. 2:13-cv-19796, 2015 WL 6509131 (S.D. W.Va. Oct. 28, 2015) (denying summary judgment on qualified immunity finding genuine issues of material fact in each *Whitley* factor in Eighth Amendment excessive force claim arising out of incident where inmate was sprayed with OC in MOCC segregation unit). The United States Court of Appeals for the Fourth Circuit ruled similarly when it vacated the district court's award of summary judgment to the defendants based on qualified immunity in prisoner's excessive force claim. *Greene,* 733 F. App'x 80. The Fourth Circuit found that based on prisoner's sworn allegations, it was objectively unreasonable for the officer to pepper spray the prisoner absent provocation because it had "long been established that prison officials violate the Eighth Amendment by using 'mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain.'" *Id.* at 82 (citation omitted).

As we have long held, "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." *Painter*, 192 W.Va. at 190, 451 S.E.2d at 756, syl. pt. 3. In considering the allegations in the light most favorable to Inmate Delgado, a reasonable jury could find that the OC spray was deployed against him unnecessarily and was

---

[28] *See Douty*, 2016 WL 3349325 (S.D. W.Va. June 15, 2016) (adopting magistrate's proposed findings and recommendation).

done "maliciously and sadistically to cause harm[,]" rather than in "a good-faith effort to maintain or restore discipline[.]" *Hudson*, 503 U.S. at 7.  We find these issues are properly left to a jury's determination.

### ii. Eighth Amendment Deliberate Indifference Claim Against the Petitioner Correctional Officers

Inmate Delgado also asserts that the petitioner officers were deliberately indifferent to his serious medical needs.  As the Fourth Circuit has explained, in order

> [t]o prevail on an Eighth Amendment claim of inadequate medical care, an inmate must allege acts or omissions sufficiently harmful to constitute deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  First, he must objectively show that the deprivation suffered or injury inflicted was "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  A sufficiently serious medical need is one that requires medical treatment. *Brice v. Virginia Beach Corr. Cntr.*, 58 F.3d 101, 104 (4th Cir. 1995).  Then, the inmate must show that the defendant acted with deliberate indifference to his serious medical need. *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970.

*Germain v. Metheny*, 539 F. App'x 108, 109 (4th Cir. 2013).  "Again, there is a subjective and an objective component to showing a violation of the right. The plaintiff must demonstrate that the officers acted with 'deliberate indifference' (subjective) to the inmate's 'serious medical needs' (objective). *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)." *Iko*, 535 F.3d at 241.

In the context of establishing a deliberate indifference claim under the Eighth Amendment, a "sufficiently serious medical need is one that requires medical treatment." *Germain*, 539 F. App'x at 109. The appendix record contains a copy of American Correctional Association, Standards for Adult Correctional ("ACA") Institutions 4-4203 (4th ed. 2003), which requires "[i]mmediate medical examination and treatment . . . in all instances involving the use of a weapon or chemical agent." West Virginia Division of Corrections Policy Directive 313.02 ("DOC Policy Directive 313.02"), also in the appendix record, is based, in part, on ACA standard 4-4203 and provides that "[a]ll persons injured in an incident receive immediate medical examination and treatment." Even assuming, as the officers argue, that they were not responsible for medically assessing Inmate Delgado, their alleged delay in properly and timely decontaminating him can constitute deliberate indifference. *See, e.g.*, *McNeeley v. Wilson*, 649 F.App'x 717, 723 (8th Cir. 2016) (finding district court had not erred in denying corrections officers qualified immunity at summary judgment stage on inmate's deliberate indifference claim where corrections officers "were on notice that delaying a proper decontamination for over twenty minutes despite prisoner's complaints about the effects of pepper spray could result in a clearly established constitutional violation"); *Stewart v. Stewart*, 60 F.App'x 20 (9th Cir. 2003) (finding prisoner's complaint satisfied objective component of deliberate indifference claim where he alleged prison officials knew of his injuries after exposure to pepper spray but delayed medical treatment and decontamination shower).

Regarding whether Inmate Delgado's injuries, as recounted above, were "sufficiently serious" under the objective component of an excessive force claim, the physical reactions he suffered due to being sprayed with OC have been found to meet the objective component of an excessive force claim. *See, e.g.*, *Tedder,* 527 F. App'x at 274 (concluding that plaintiff "created a genuine issue of material fact on the objective component of his Eighth Amendment excessive force claim" where his "adverse physical reactions to the pepper spray–gagging, breathing difficulty, and vomiting–establishe[d] that the nature of the force [the defendant correctional officer] used against [him] was nontrivial").

Turning to the subjective component of a deliberate indifference claim, the officer must have actual knowledge of the risk of harm to the inmate, and he must also have recognized that his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs. *Iko*, 535 F.3d at 241. Here, such recognition was arguably supplied by DOC Policy Directive 313.02, which provides that "[a]ll persons injured in an incident receive immediate medical examination and treatment." Moreover, product literature in the appendix record shows that the effects of MK-9 Phantom OC, the OC spray used in this instance, can include coughing, choking, gagging, difficulty breathing, vomiting, and that its disbursement less than six feet away can cause soft tissue damage, which symptoms have been found to be nontrivial, as discussed above.

32

Here, the petitioner officers assert that any alleged errors in the decontamination process that occurred following their deployment of OC spray against Inmate Delgado were the result of their discretionary decisions. They further assert that the initial delay in removing Inmate Delgado from his cell for purposes of decontamination was attributable to their need to obtain a video camera to record the cell extraction. Arguing further, they contend that their discretionary refusal to remove Inmate Delgado's mechanical wrist restraints, as he had requested, was to ensure safety and security on the recreation yard where the decontamination process was to occur. They maintain there is no evidence that they knowingly disregarded an excessive risk to inmate health or safety, adding there was some self-decontamination when Inmate Delgado splashed water on his hands and face in his cell prior to what they refer to as his "water supply being exhausted."[29]

As recounted above, Inmate Delgado offers a significantly different version of events. He maintains the officers shut off the water to his cell for the expressly stated purpose of preventing him from self-decontaminating, which caused him to continue to suffer the effects of the OC spray. Then, the officers waited for a period of time before taking him to the recreation yard for the purpose of beginning the decontamination process and where they refused to remove his handcuffs, effectively preventing any preliminary

---

[29] Although the petitioners euphemistically employ the word "exhaustion," which implies the simple depletion of a limited quantity, they admit to having purposefully shut off the water supply to Inmate Delgado's cell.

33

decontamination. Thereafter, he was taken to a multiple purpose room where he should have been medically assessed, but Nurse Coleman read a book instead. Through all of this, he remained in clothing soaked with OC spray, again causing him to continue to suffer pain. In total, Inmate Delago asserts that approximately one hour elapsed before he was allowed to shower and finally remove the OC spray from his body.

Again, we express no view on the merits of Inmate Delgado's deliberate indifference claim. However, in drawing "any permissible inference from the underlying facts in the light most favorable to the party opposing the motion[,]" *Painter*, 192 W.Va. at 192, 451 S.E.2d at 758, and in adopting . . . [his] version of the facts[,]" *Scott*, 550 U.S. at 378, we find there are genuine issues of material fact concerning the objective and subjective components of Inmate Delgado's deliberate indifference claim. In particular, there are genuine issues of material fact regarding the extent of Inmate Delgado's injuries, as well as the officers' actions and inactions toward him following the deployment of the OC spray. These material issues of fact prevent us from awarding summary judgment to the petitioner officers on the basis of qualified immunity. It will be for a jury, not this Court, to determine the truth of the matter.

### iii. Supervisory Liability Claim Against Warden Ballard

Warden Ballard asserts that he should be immune from Inmate Delgado's supervisory liability claim. He argues that his administrative policy-making functions are grounded in his adherence to certain policies in the treatment of inmates at MOCC. Although denying he had declared "martial law" in the segregation units at MOCC, Warden Ballard contends that any directive that "efforts to temper" were not required in the segregation units would not violate any statute or constitutional rights through which entitlement to qualified immunity would be foreclosed. Lastly, Warden Ballard maintains that he cannot be liable under any theory of supervisory liability.

We begin by observing that supervisory liability is not premised upon respondeat superior but upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984). To defeat qualified immunity on a claim of supervisory liability, a plaintiff must show that it was clearly established at the time of the subordinate's conduct that the supervisor could be held liable under § 1983 for constitutional violations committed by the subordinate; that the supervisor knew that the degree of force being used was unconstitutional; and that a reasonable person in the supervisor's position would have known

that his actions were unlawful. *Shaw v. Stroud*, 13 F.3d 791, 801 (4th Cir. 1994). Necessary to the establishment of supervisory liability are the following three elements:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799 (citations omitted).

Turning to the first *Shaw* factor, a plaintiff must show "(1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Id.* (citing *Slakan*, 737 F.2d at 373). These factors are met here.

At the time of the subject incident, the law was clearly established that the use of pepper spray on a inmate who is passive or attempting some compliance can constitute excessive force. *See Iko,* 535 F.3d at 235; *see also Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002) (internal citations omitted) (denying qualified immunity to officer who sprayed inmate with pepper spray, recognizing that " order and discipline are important in running a correctional institution, but that does not authorize the arbitrary use of force, . . . nor does

36

it justify punitive use of force on difficult inmates not posing a real threat to other persons or raising security concerns"). Further, the appendix record contains evidence that shows Warden Ballard had the authority and responsibility for the administration and operation of MOCC, including the safety and security of inmates, and for ensuring that MOCC employees abide by MOCC policies and procedures, including the policy that correctional officers were not required to temper force in their interactions with inmates housed in the segregation units at MOCC. Regarding Warden Ballard's knowledge that his subordinates were engaged in uses of force, there is evidence that he reviews all inmate grievances, all incident reports filed by correctional officers, and all Use of Force Review Committee reports. Through these administrative processes and reports, Warden Ballard would have been aware of the OC spray being used against inmates housed in the segregation units. And, because inmates must exhaust their administrative remedies prior to filing a court action,[30] Warden Ballard would have been aware of these uses of force prior to him being named as a defendant in the multiple federal lawsuits listed above.

Regarding Warden Ballard's response to his awareness of the use of OC spray on inmates in the segregation units and whether there is a link between his actions and the

---

[30] *See Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("exhaustion requirement [under Prison Litigation Reform Act] applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.").

alleged constitutional injury, *Shaw*, 13 F.3d at 799, we have the allegation that he had declared "martial law" in the segregation units. Although he testified during his deposition that he had not done so, again, there is conflicting evidence. For example, when an MOCC inmate housed in the segregation units completed a Unit Team Request Form, asking whether a correctional officer had been truthful in telling him that the segregation units were under "Martial Law[,]" a lieutenant provided a written response that stated: "Per warden, martial law is a condition that MOCC utilizes." There is also an audio-recording of a disciplinary hearing during which an MOCC correctional officer testified that "[t]here's martial law going on right now" and "they told me that came from the Warden." In addition, Inmate Delgado testified during his deposition concerning his understanding from correctional officers that the segregation units were "under Martial Law and that we could be sprayed for any reason or for no reason at all."

Based on the evidence summarized above, a reasonable jury could conclude that Warden Ballard had actual, subjective awareness of a pervasive and unreasonable risk posed by his correctional officers who were allegedly engaging in unnecessary and untempered force against inmates housed in the segregation units as a result of prison policies and directives, which is the first *Shaw* factor. This same evidence could also lead a jury to find that the second and third *Shaw* factors were also met: that Warden Ballard's response to the knowledge of the risk being posed was so inadequate as to show "'deliberate

38

indifference to or tacit authorization of the alleged offensive practices,'" particularly when he confirmed during his deposition testimony that a correctional officer cannot be reprimanded for not using "confrontational avoidance measures"with inmates housed in a segregation unit; and "that there was an 'affirmative causal link' between [Warden Ballard's] inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 F.3d at 799 (citation omitted); *see also Slakan*, 737 F.2d at 376 (citation omitted) (observing that causation may be proved directly "'where the policy commands the injury of which the plaintiff complains . . . . [o]r may be supplied by [the] tort principle that holds a person liable for the natural consequences of his actions.'"). Indeed, some, if not all, of this same evidence prompted the federal district court to deny Warden Ballard's motion for summary judgment based on qualified immunity, finding

> there are material issues of fact as to whether Defendant Ballard authorized the use of "martial law." Construing the evidence in a light most favor[able] to Plaintiff, the undersigned finds evidence exists indicating that Defendant Ballard was aware of an unreasonable risk of harm or misconduct by Defendants and failed to take corrective action.

*See Douty*, 2016 WL 3349325, at *17;[31] *see also Cantrell*, 2016 WL 5660339 (adopting magistrate's proposed findings and recommendation denying motion for summary judgment

---

[31] Inmate Delgado represents that when the parties proceeded to trial after summary judgment was denied in *Douty*, a jury found Warden Ballard liable for supervisory liability, assessing punitive damages, based on facts nearly identical to those in the case at bar. *Douty*, 2:13-cv-32832 (S.D. W.Va. July 24, 2017), Dkt. No. 267 (proposed judgment order; entry pending).

based supervisory liability claim against Warden Ballard based on some of this same evidence).

Given the genuine issues of material fact in this matter, we cannot determine whether Warden Ballard is entitled to summary judgment based on qualified immunity. As with the claims against the petitioner officers, it will be for a jury to determine the factual disputes entangled with the supervisory liability claim asserted against Warden Ballard.

### B. Sufficiency of Order Denying Summary Judgment

The petitioners assert that the circuit court erred by entering a summary judgment order, which was prepared by Inmate Delgado's counsel[32] and which they argue contains inaccurate factual findings[33] and conclusions of law that were not set forth by the circuit court on the record during the hearing on their summary judgment motions. They further assert that Inmate Delgado did not attach any exhibits to his response to the summary

---

[32] West Virginia Trial Court Rule 24 expressly provides for our trial courts to direct counsel to prepare orders. Moreover, this Court has ruled that when an order entered by a circuit court is one that has been prepared by a party, we will only disturb the order if the findings are clearly erroneous. *Kalwar v. Liberty Mut. Ins. Co.*, 203 W.Va. 2, 7, 506 S.E.2d 39, 44 (1998). Here, we do not find the circuit court's findings to be clearly erroneous.

[33] The petitioners' argument in this regard is generalized and does not specifically set forth these alleged inaccuracies.

judgment motions to support what his counsel would later rely upon in drafting the summary judgment order that the circuit court entered.

Labeling petitioners' arguments as "perplexing," Inmate Delgado asserts the circuit court's seventeen-page order contains a lengthy recital of the evidence in the light most favorable to him, the nonmoving party, as well as the legal standard for qualified immunity and summary judgment before concluding there are genuine issues of material fact precluding the granting summary judgment at this stage. He further asserts that the petitioners complain only generally about the circuit court's factual findings without identifying any specific facts that they contend are not in the record.

We have previously addressed the sufficiency of circuit court orders in this context, holding that

> [a] circuit court's order denying summary judgment on qualified immunity grounds on the basis of disputed issues of material fact must contain sufficient detail to permit meaningful appellate review. In particular, the court must identify those material facts which are disputed by competent evidence and must provide a description of the competing evidence or inferences therefrom giving rise to the dispute which preclude summary disposition.

*Payne*, 231 W.Va. at 566, 746 S.E.2d at 556-57, syl. pt. 4. We find the circuit court's order meets the *Payne* standard.

Further, and notwithstanding the petitioners' arguments to the contrary, trial courts are not required to make their findings during a hearing.[34] As we explained in *Legg v. Felinton*, 219 W.Va. 478, 637 S.E.2d 576 (2006),

> [i]t is a paramount principle of jurisprudence that a court speaks only through its orders. *See State v. White*, 188 W.Va. 534, 536 n.2, 425 S.E.2d 210, 212 n.2 (1992) ("[H]aving held that a court speaks through its orders, we are left to decide this case within the parameters of the circuit court's order." (citations omitted)); *State ex rel. Erlewine v. Thompson*, 156 W.Va. 714, 718, 207 S.E.2d 105, 107 (1973) ("A court of record speaks only through its orders[.]" (citations omitted)).

*Legg,* 219 W.Va. at 483, 637 S.E.2d at 581. Moreover, the mere preparation of an order at a circuit court's direction does not mean the court is obligated to enter it. It is clearly within the authority of a circuit court to alter or amend a proposed order in anyway it deems appropriate.

Having reviewed the transcript of the hearing on the summary judgment motions, we find that the circuit court allowed the parties to fully address their varying positions on the facts and the law. In addition to the circuit court's thorough order, it is equally clear that the court was fully prepared for the hearing and had reviewed all relevant materials and applicable law. Indeed, we are left with the firm conviction that the circuit

---

[34] Although the petitioners assert that the circuit court did not specifically address the basis for its denial of qualified immunity during oral argument, we note the absence of any specific requests or objections in this regard by the petitioners during the motions hearing.

court understood the legal issues being raised, the parties conflicting factual allegations, and their respective positions on the issue of qualified immunity,[35] all of which is adequately reflected in the circuit court's lengthy order. Rather than being deficient or inaccurate, we find the circuit court's well-reasoned order sufficiently addresses the parties' disparate factual allegations and the legal standards upon which the court's decision was based.

Further criticizing the circuit court's order, the petitioners assert that the order may only contain statements made during the motions hearing or can only be based on exhibits attached to Inmate Delgado's responses in opposition to their motions for summary judgment. We find no merit in this argument. In fact, when ruling "'[o]n a motion for summary judgment *all papers of record* and all matters submitted by both parties should be considered by the court.' Syllabus Point 2, *Aetna Cas. & Sur. v. Fed. Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syl. Pt. 3, *Ford v. Dickerson*, 222 W.Va. 61, 662 S.E.2d 503 (2008) (emphasis added). Similarly, West Virginia Rule of Civil Procedure 56(c) provides, in part, that the "judgment sought shall be rendered forthwith if *the pleadings, depositions, answers to interrogatories, and admissions on file,* together with affidavits, if

---

[35] The hearing transcript reveals that the petitioners had a full opportunity to explain their qualified immunity arguments, which the circuit court then summarized during the hearing, asking: "[Y]ou're arguing that your clients are entitled to qualified immunity, that these were discretionary actions, and that they did this in good faith, and that there's no violation of clearly established laws as it relates to any actions that they took?" The petitioners' counsel replied in the affirmative.

43

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (emphasis added). Accordingly, we find no error to the extent the circuit court relied upon pleadings or any other "papers of record" in this action when rendering its decision. *Aetna Cas. & Sur. Co.,* 148 W.Va. at 170, 133 S.E.2d at 776.

Lastly, in reviewing a motion for summary judgment based on a claim of qualified immunity, the factual allegations are to be viewed in the light most favorable to the party opposing the motion. The circuit court did precisely that, explaining on the first page of said order:

> *The following findings of fact are set forth viewing the record in the light most favorable to the non-moving party, Mr. Delgado, as required for ruling on a motion for summary judgment. See, e.g., Scott v. Harris,* 550 U.S. 372, 377 (2007) ("[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the judgment motion. In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts.").

(Emphasis added). Accordingly, we find no error in the circuit court's factual recitation, particularly where the circuit court's order also summarized the petitioners' countervailing facts.

44

## IV. Conclusion

For the reasons stated above, the circuit court's March 9, 2017, order denying summary judgment based on qualified immunity is hereby affirmed.

Affirmed.